Margaret E. Johnson MALMSTEDT and Bertil Malmstedt, Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellee.

Margaret E. Johnson MALMSTEDT and Bertil Malmstedt, Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Appellant.

Nos. 77–1393, 77–1394.

United States Court of Appeals, Fourth Circuit.

Argued March 7, 1978.

Decided May 26, 1978.

Sylman I. Euzent, Kensington, Md., for appellants in 77–1393 and appellees in 77–1394.

William Estabrook, III, Tax Div., Dept. of Justice, Washington, D. C. (Myron C. Baum, Acting Asst. Atty. Gen., Gilbert E. Andrews and Gary R. Allen, Tax Div., Dept. of Justice, Washington, D. C., on brief), for appellee in 77–1393 and appellant in 77–1394.

Before BRYAN, Senior Circuit Judge, and RUSSELL and HALL, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

This controversy arises out of the operation during 1958–1964 of a real estate development business in which the taxpayer was an equal partner. Prior to the formation of this partnership the taxpayer had been involved in the real estate business primarily as a realtor dealing in development property. Her earliest connection with either the real estate or the construction business began in the late 1940s when she became a bookkeeper for a concern so engaged. She, however, did not confine herself, as the years passed, to a bookkeeping role but actively involved herself in all phases of the business. In the early 1950s she left this employment and became an independent realtor, operating primarily in that part of Montgomery County, Maryland, included in the Greater Washington area. In this capacity she met Bertil Malmstedt and became associated with him in his existing business activities.

Bertil Malmstedt had been engaged in the construction and development business since 1937. He began with the construction of garages on Staten Island, New York. This activity was interrupted by the war. After the war, he joined Spiller Construction Company as a partner. This partnership constructed and developed an 86-house complex on Staten Island and the Templeton Knolls project in Riverdale, Maryland, consisting of 300 semi-detached houses. He later severed his connection with Spiller and Company and joined Frank and Company, again, as a partner. Frank and Company, also, was involved in real estate development. The latter partnership developed Fairlawn in the Washington area. It consisted of 257 detached houses. With the completion of this project, he embarked on real estate development and construction of his own, trading under the style generally of Torpet Construction Company (hereinafter referred to as Construction). It was while so engaged that he met the taxpayer and engaged her services initially in locating and aiding him in connection with possible developments in that part of Montgomery County which was within the area generally known as Greater Washington. This connection ripened into a partnership arrangement between Malmstedt and the taxpayer in 1958.[1] The purpose of the partnership was to engage in real estate developments in Montgomery County adjacent to the District of Columbia.

1. It seems that the partnership operated initially under the trade name of Torpet Construction Company and later under the corporate name of Torpet Construction Company, Inc. The partnership, however, represented a continuation of the business previously carried on by Malmstedt individually using that trade name.

Immediately after its formation, the partnership began aggressively to interest itself in real estate developments in the Montgomery County area. Its first venture seems to have been an offhand development of a small two-acre area known as Beam Court in Bethesda, Maryland in late 1958 or early 1959. The first substantial development undertaken by the partnership, however, took place in 1959. This was the da da Woods development which was intended as a quality residential project. Located in Montgomery County, some ten miles west of the City of Washington, near the C & O Canal National Park and with easy access to the new highway 495, it consisted originally of 30 acres, later enlarged by the acquisition of an additional 15 acres. It was the first development in Montgomery County with all electrical and telephone lines underground. For its design and development of a model house in the extensive development planned in the area, the partnership received first prize by the National Homebuilders. This proposed development led directly into the Gold Mine project, the development of which is primarily the subject of this controversy.

A part of the land involved in da da Woods had been acquired from one Swanson, who also owned the Gold Mine property, consisting of 338 acres, located opposite the da da Woods development. At about the time the partnership acquired the da da Woods tract, Swanson suggested to the partnership the purchase by it of the Gold Mine property. It seems to have been in the mind of Swanson, as well as of the members of the partnership that this property presented a natural expansion of their developments in the area. Negotiations followed between Swanson and the partnership for the purchase of the Gold Mine property by the latter. These resulted in the acquisition of the Gold Mine property by the partnership in November, 1959. The purpose of the acquisition was plainly for purposes of commercial development.

The purchase price of Gold Mine was $1,000,000, less a $30,000 real estate commission to the partnership. The purchase was financed by the partnership by the execution of a first lien, securing an indebtedness of $375,000 and by the delivery of a note to Swanson, secured by a second lien, for $750,000.[2] The partnership concluded that the best type of development for the property would be as the site of a luxury type hotel. It actively proceeded with such a project. Before it could proceed, however, it was necessary to have the property rezoned for commercial purposes and to arrange for necessary water and sewer connections. After considerable effort, it succeeded in securing both the necessary rezoning and the water for sewer facilities. At the same time it had engaged the services of a nationally known architect to prepare plans and models for the development. In maintaining the property and in arranging for its development, during the period of 1959 to 1964, the partnership expended over $500,000.

The partnership pursued a number of avenues in developing an interest by responsible parties in the operation of the hotel envisaged for the venture. Among those so interested was the Steigenberger group in Frankfurt, Germany. This group indicated by letter in December, 1962 that they thought "that it would be possible that our company might be able to guarantee a rent of about 1 million $." To support this indication of interest, the partnership undertook to secure the necessary financing for the project. The well-known mortgage banking firm of S. L. Hammerman Organization, Inc. in Baltimore, after reviewing an analysis of the financial aspect of the project, indicated that it thought it could secure the necessary financing if the project were supported by an operating agreement as expected with a European hotel operating company. However, Steigenberger unexpectedly changed its position and expressed no further interest in the project.

2. The record is not clear with reference to the disposition of the extra $125,000, realized by the partnership as a result of these loans.

During the same time that all this activity in the Gold Mine venture was taking place, the partnership had acquired in 1961 and had undertaken the development of a residential subdivision of a tract of 118 acres in the same general area known as Potomac Ranch. The expense connected with the Gold Mine project and the development of the Potomac Ranch had apparently placed the partnership in financial difficulties. In an attempt to relieve these financial problems, it refinanced in early 1962 the indebtedness to Swanson by obtaining a new loan of $775,000, secured by a second lien on the Gold Mine property. In connection with such loan, they were forced to pay a fee of $150,000. When the partnership was unable to meet interest payments on this new debt, the creditors of the partnership involved in both the Potomac Ranch and the Gold Mine ventures filed foreclosure proceedings in the fall of 1963.

A judicial sale of the Gold Mine property under foreclosure of the second deed of trust thereon resulted in a sale in November, 1963. Malmstedt was not disposed to make any attempt to retain the property by bidding at such judicial sale; the taxpayer, however, wished to make an effort at continuing the venture by so bidding. Because of this difference between the parties, Malmstedt withdrew from the partnership, assigning to the taxpayer his interest. At the judicial sale, the taxpayer entered the highest bid of $1,625,000. She made a deposit of $25,000 against her bid. She was, however, unable to comply and the property was resold in March, 1964, to the holder of the second lien for a bid price of $1,600,000.[3]

Thereafter the Service audited the tax returns of the taxpayer for the years 1964, 1965 and 1966. In the course of that audit, the agent asserted a tax deficiency. The Commissioner affirmed the finding of a deficiency and on appeal to the Tax Court the conclusions of the Commissioner, with certain modifications, were affirmed.[4] From that decision of the Tax Court both the taxpayer and the Commissioner have appealed.

The appeal of the taxpayer focuses on the calculation of taxable gain realized by her in connection with the Gold Mine venture. It was the finding of the Tax Court that the taxpayer, despite the fact that she had lost the property along with her share of the more than half million dollars expended on its futile development, realized a substantial capital gain as a result of the sale of the property. This finding rested upon a determination of the taxpayer's basis in the property. It was the taxpayer's position that the partnership basis, for computing gain on the sale, should be the original price of the property, plus all expenses incurred in the development and maintenance of the property during the partnership's ownership and development endeavors. There was no dispute with reference to these two amounts, which the taxpayer claimed aggregated the partnership's capitalized basis for the property. The Tax Court itself found that the partnership had "expended $528,664.19 in the aborted development of Gold Mine." It had fixed the cost of the property at $970,000.[5] Had this method of calculating the cost basis been adopted ($970,000 + $528,664.19), the taxpayer would have realized no gain as a result of the foreclosure sale.

The Tax Court, however, eliminated certain of the expenditures made by the partnership in the development of the Gold Mine property as proper items for capitalization in fixing the partnership's cost basis in the property. It was such elimination which gave rise to the finding of a taxable

---

3. The lender successfully bid in the property for $1,600,000. The purchase price, plus the forfeited $25,000 was applied against taxes, interest, and costs of sale, as well as the $775,000 and the $750,000 mortgage loans. A deficiency judgment was entered against the partners in the amount of $69,881.18, from which they were released in 1965, when the property was sold for $1,725,000.

4. 35 T.C. 199.

5. It deducted from the purchase price of $1,000,000, the $30,000 brokerage fee received by the taxpayer in connection with the purchase, thereby fixing the partnership basis in the property at $970,000.

gain by the taxpayer. The items so eliminated were (1) the interest payments on the loan made in connection with the venture (*i. e.*, $183,614.11), (2) payment of real estate taxes on the property after acquisition (*i. e.*, $5,665.62), and (3) the loan refinancing fee (*i. e.*, $150,000). The basis for eliminating the first two items was that they were expense items and not capital expenditures; the third item, the Tax Court found should not be included as a capital expenditure or as a current expense item but should be amortized over the life of the loan.

The taxpayer does not on this appeal seriously contest the finding of the Tax Court that the interest and tax payments must be considered as expense items and not as capital expenditures or that the refinancing fee must be amortized over the life of the loan. But she vigorously asserts that the interest and tax payments should be declared business expenses deductible as such in the year made, with a carry-forward of any excess of such payments over the income received by her during such year. So far as the loan fee is concerned, her position is that when the deed of trust securing the refinanced debt was foreclosed by way of a forced judicial sale, the unamortized part of this loan fee should be treated as maturing into a business expense in the year when the foreclosure sale was had. These contentions, if accepted in whole or in part, would either eliminate any tax deficiency on the part of the taxpayer or substantially reduce it. The Tax Court, however, denied the taxpayer a right to claim her share of the interest and tax payments as business expenses qualifying as deductions under § 162, 26 U.S.C. or the right to claim as a business expense deduction the unamortized part of the loan fee. It held that all such items must be treated as non-business expenditures deductible under § 172(d)(4), 26 U.S.C., only to the extent of the taxpayer's non-business income. It is in essence this determination of the Tax Court which presents the only real issue posed by the taxpayer on this appeal.

It is important to note at the very outset of our consideration of this issue, as presented by the taxpayer, that the Tax Court did not deny that the interest and tax expenses were properly incurred in connection with the Gold Mine venture. In fact, it found expressly these, as well as all the other expenditures claimed by the taxpayer in this connection, were "expended * * in the aborted development of Gold Mine." Similarly, it specifically acknowledged that the taxpayer was both "involved in the trade or business of real estate development well prior to the commencement of the Gold Mine venture," as well as during its attempted development of the project. Its decision to deny deductibility of the items as business expenses began with the premise that residential development and commercial development are entirely separate and distinct types of businesses and that the partnership in which the taxpayer was involved had engaged only in residential development "on a modest scale" prior to undertaking the Gold Mine development. It concluded from this premise that the Gold Mine venture, representing as it did a commercial development, was to be treated as an attempt by the partnership to enter a distinctly new type of business which never materialized beyond "the formative" or "investigatory" stage, and that any expenses connected with such an undertaking did not qualify as business expenses under § 162.

The difficulty with the Tax Court's reasoning arises out of its key premise that commercial and residential developments are to be considered and treated as entirely separate, distinct and, in a sense, unrelated businesses and that any extension from one into the other, however, natural, must be considered as engaging in a new business. Such a sharp and inflexible differentiation in the two types of real estate development is not supported by common experience and is contrary to our decision in *York v. Commissioner of Internal Revenue* (4th Cir. 1958) 261 F.2d 421. In that case a real estate developer, who had theretofore confined his business to the development of "residential and shopping center areas" without any "experience with industrial property," which the taxpayer even said "presented different problems from those

arising in the area of his experience,"[6] undertook an industrial development, in connection with which he incurred various expenses. These expenses, the taxpayer claimed, qualified as business expenses. The Commissioner contended, however, that the taxpayer "was not engaged in a trade or business to which this expenditure was proximately related."[7] In language which was practically identical with that used by it here, the Tax Court said:

> " * * * it is readily apparent that the trade or business of promoting and developing residential and shopping center areas is separate and apart from that of promoting and developing industrial acreage, and that petitioner's trade or business at the time of the survey was restricted to promotion and development of residential and shopping center properties."[8]

It accordingly found that such expenses did not qualify as business expenses. In reversing as clearly erroneous such finding, we said that the line between residential and shopping center developments, on the one hand, and industrial development, on the other, was "neither wide nor radical." "Indeed," we said that "the line of demarcation between them is obscure" and that the attempt of the taxpayer to engage in industrial development was "but the cultivation of a sector already within the compass of his field" and was no more than a reasonable and natural expansion of his existing normal business activity.[9]

■ We perceive no distinction between the commercial developer undertaking industrial development in *York* and the residential developer undertaking commercial development in this case. The expansion in both cases was a reasonable and natural one, representing but "the cultivation" of a business within the normal scope of real estate development generally. Moreover, our conclusion in *York* was substantially the same as that reached by the Tax Court itself in *Cornelius Vanderbilt, Jr.* (1975) ¶ 57,235 P–H Memo TC. There a writer and lecturer incurred expenses in a futile effort to interest television networks in his employment as the narrator of a weekly television series. The Commissioner denied a deduction of such expenses as business expenses deductible under § 162, saying that "the television field was new and separate from those fields in which petitioner had hitherto engaged and * * * the negotiations were unsuccessful and petitioner never entered this new enterprise." Incidentally, this is much the same language as was used by the Tax Court in this case. But the Tax Court reversed in the *Vanderbilt Case,* observing:

> "We think the Commissioner's argument is without merit. We agree with the legal principle cited by the Commissioner, namely that legal expenses incurred in investigating and looking for a new business are not deductible as ordinary and necessary business expenses. Morton Frank, supra. However, in our opinion that principle is not applicable here since we think the legal fees were proximately related to petitioner's trade or business and did not relate to an attempt to open a new field of activity for petitioner. Josephs attempted to 'sell' petitioner as the narrator of a travelogue series on television. Instead of presenting lectures in person on the subject of travel, with accompanying film, petitioner would narrate travel film on television. This is incident to his trade or business of being an author and lecturer and is directly related thereto. We hold that the portion of the legal fee which relates to Josephs' negotiations with television networks and advertising agencies is deductible as an ordinary and necessary business expense."[10]

Moreover, the Tax Court clearly distinguished the *Polachek Case* on which the Tax Court primarily relies in this case. It said:

**6.** 29 T.C. 520, 522.

**7.** 29 T.C. at 526.

**8.** 29 T.C. at 527.

**9.** 261 F.2d at 422.

**10.** ¶ 57,235 P–H Memo TC at 922.

"The cases cited by the Commissioner are clearly distinguishable. In each of the Frank, Cunningham, and Polachek cases [Morton Frank, 20 T.C. 511 (1953), Frank B. Polachek, 22 T.C. 858 (1954), and Allan Cunningham, 22 T.C. 906 (1954).] the expenses incurred by the taxpayers were preparatory to locating business ventures of their own. In the former two cases the taxpayers, at the time the expenses were incurred, were not engaged in a trade or business other than as employees and none of the claimed expenses were incurred in connection with their employment; and in the latter case the taxpayer was not engaged in any trade or business at all at the time the expenses were incurred. It followed in each case that the expenses were not deductible as ordinary and necessary business expenses." [11]

Unquestionably, the taxpayer's involvement in commercial development at the Gold Mine location, which was situated directly opposite its residential development at da da Woods, was "proximately related" to its business of real estate development and may not be dismissed as an unsuccessful effort to engage in a new, distinct and unrelated business, any more than the taxpayer's unsuccessful efforts in either York or Vanderbilt. And, as the quotation from Vanderbilt demonstrates, there is no parallel here with Polachek, on which the Tax Court primarily relies and in which the taxpayer actually had no existing business to which his expense could be considered as "proximately related." [12] The Taxpayer in Polachek was simply seeking to find some business, any business, in which he might engage. That is quite different from this case, where the Tax Court has found that the taxpayer was engaged in business, in fact, had been "long engaged" in real estate business.

■ The Tax Court, recognizing the plain factual similarity of this case with York, sought to distinguish it. We do not find its rationale for such distinction persuasive. In fact, the circumstances of this case seem stronger for the taxpayer than those in York. Unlike the developer in York, who undertook industrial development with considerable reluctance because of his lack of familiarity in that field and only after a long experience limited strictly to other types of development, the partnership of which the taxpayer in this case was a member began almost immediately after its formation to undertake both residential and commercial development. It is true that its first development was a small 2-acre residential development but the partnership's earliest developments of substance were the da da Woods residential development and the Gold Mine commercial venture, located on lands purchased from the same owner and situate across the road from each other. Both of these latter developments were begun almost simultaneously and within a matter of months after the partnership was formed. One was a residential development; the other was a commercial development. From 1959 to 1961 these two developments—one residential and the other commercial—constituted the business venture on which the partnership was engaged. On these two developments the partnership

11. Id. at 922.

12. The Tax Court, also, cites *Richmond Television Corporation v. United States* (4th Cir. 1965) 345 F.2d 901, remanded on another issue, 382 U.S. 68, 86 S.Ct. 233, 15 L.Ed.2d 143 and *Werner Abegg* (1968) 50 T.C. 145, *aff'd.* 429 F.2d 1209 (2d Cir. 1970), *cert. denied* 400 U.S. 1008, 91 S.Ct. 566, 27 L.Ed.2d 621 (1971). Neither meets the situation here. In the first case, the taxpayer sought to deduct expenses incurred in connection with a television business which it was not licensed to operate; in short, it sought to deduct as a business expense expenditures made in a business in which it could not at the time engage. This distinction is made clear in *Colorado Springs National Bank v. United States* (10th Cir. 1974) 505 F.2d 1185 at 1190—a distinction approved by us in *First Nat. Bank of South Carolina v. U. S.* (4th Cir. 1977) 558 F.2d 721 at 723. In *Werner Abegg,* the taxpayer sought to deduct the salary of an officer in an inactive corporation who was engaged simply in trying to find a business in which to invest the funds of the corporation; the taxpayer was like the taxpayer in *Polachek* engaged in no business. *See* 429 F.2d at 1211, n. 1. However, the Tax Court found expressly in this case that the taxpayer was engaged in a going business of real estate development.

in these years focused its efforts with like intensity. It was only in 1961 that the partnership undertook another residential development (the Potomac Ranch development). In the light of these undisputed facts, it seems clearly erroneous to find that the partnership business was confined to residential development or to liken its involvement in the business development at Gold Mine as merely an investigating excursion looking to a possible involvement in commercial development. The partnership was not considering entering business development. It had passed that point when it purchased Gold Mine for a million dollars and then proceeded to invest a half million in an attempt at development. It matters not that its efforts were unsuccessful. Success is not the test of deductibility as a business expense. The test is whether the business was undertaken "in good faith for the purpose of making a profit." *Lamont v. C. I. R.* (2d Cir. 1964) 339 F.2d 377, 380; *Mercer v. C. I. R.* (9th Cir. 1967) 376 F.2d 708, 710. Certainly, the partnership's undertaking in commercial development at Gold Mine satisfied that test.

█ The Tax Court seemed to rest its distinction on what it declares to be "the vast qualitative differences between petitioners' earlier ventures and the Gold Mine venture * * *." If by this term "qualitative differences" the Tax Court is repeating its attempted distinction between residential and commercial development, then the distinction runs counter to what we held in *York,* as we have just observed. If, however, the Tax Court is using the term

"qualitative differences" to support a distinction based on differences in the size or scope of the several ventures, we are unable to discern the basis for the distinction sought to be made by the Tax Court. After all, it is not the size of the undertakings but their similarity as business activities,— whether the questioned activity represents simply the normal expansion of the existing business or whether it is within the "compass" of the existing business,—which is determinative of whether the questioned activity· represents a new and unrelated business venture for the purposes of applying § 162.[13] So tested, we discern no basis for the finding by the Tax Court that the Gold Mine venture was a new and unrelated business. Accordingly, the Tax Court was in clear error in holding that interest and tax payments made by the partnership in connection with the Gold Mine venture were not deductible as business expenses under § 162. *See, Union Mut. Life Ins. Co. v. United States* (D.Maine, S.D.1976) 420 F.Supp. 1181, 1198.

█ The third item in dispute under the taxpayer's claim of error was the refinancing fee paid by the partnership in connection with the Gold Mine venture. The Tax Court was correct in holding that such refinancing fee was to be amortized over the life of the loan and· could not be deducted as a business expense in the year paid.[14] But when the loan was called on account of default and the deed of trust was foreclosed, the unamortized portion of such fee could be deducted in the year in which the property was sold.[15] *See, Herbert Enoch*

13. If this issue were to turn on any "qualitative" difference in the residential developments and the business development ventures of the partnership, we are by no means certain that it is fair to characterize those residential developments as "modest." Certainly the da da Woods and Potomac Ranch developments would hardly be considered as "modest" undertakings. If to these are added the several developments of Construction prior to the taxpayer's joining the partnership, the use of the term "modest" becomes even more inappropriate as a criterion for determining whether the Gold Mine venture was a new business of partnership. We have not, however, pursued this point because we do not believe this a proper

criterion for resolving the issue of whether the business development was a new business for the partnership. Under this test, anytime an existing business embarked upon a large expansion, even within the "compass" of its existing business, it might be found to be engaging in a new business. *Cf. Snow v. Commissioner* (1974) 416 U.S. 500, 504, 94 S.Ct. 1876, 40 L.Ed.2d 336.

14. *Detroit Consolidated Theatres, Inc. v. Commissioner* (6th Cir. 1942) 133 F.2d 200.

15. In *Herbert Enoch,* the Tax Court said:
"However, the petitioner is correct in pointing out that should we find these ex-

(1972) 57 T.C. 781, 795; *Metropolitan Properties Corp. v. Commissioner* (1931) 24 B.T.A. 220, 225.

It follows that there must be a recomputation of the taxpayer's tax liability, if any, after giving effect to the changes required under our ruling on the deductibility of interest and tax payments and the treatment of the unamortized portion of the refinancing fee. The allocation of such deduction among the tax years involved and right of carry-forward of any of such deductions are matters that can only be resolved on remand.

The Commissioner, in his appeal, on the other hand, challenges the Tax Court's calculation of the taxpayer's basis in stock of Torpet Construction Company, Inc. for purposes of computing the amount of deduction available upon that stock becoming worthless in 1964. The Tax Court determined that the taxpayer's basis in this stock was $82,062.32. It offered no explanation for this finding. The Commissioner has attacked this finding, citing a number of items which apparently were included in the Tax Court's calculations but which it asserts were not properly includable under the Commissioner's reasoning. Since the cause must be remanded for further proceeding, we shall remand, also, this calculation so that the Tax Court may provide an explanation for its finding of the taxpayer's

basis in this stock. Without such explanation, review of the Tax Court's finding in this regard may not be had.

The cause is accordingly remanded to the Tax Court for further proceedings in conformity with this opinion.

penditures to be capital expenditures which were the obligations of R.R.R., then the corporation is entitled to deduct the entire unamortized portion of the loan fees upon the 1964 sale of the property. See S. & L. Building Corporation, 19 B.T.A. 788, 796 (1930), revd. 60 F.2d 719 (C.A.2, 1932), revd. 288 U.S. 406 [53 S.Ct. 428, 77 L.Ed. 861] (1933); '[I]n the case of sale of any of the mortgaged property, the unamortized portion of the mortgage fee relating thereto was written off at the time of such sale.' See also *Longview Hilton Hotel Co.*, 9 T.C. 180 (1947)." 57 T.C. at 795.

The reasoning for this conclusion was stated in 16 Tax Coordinator 2d, L–1517 (1978 updated):

"The Tax Court has held that the unamortized portion of fees and commissions paid in obtaining a mortgage loan can be deducted in full in the year the mortgaged property is sold. This is so whether the buyer assumes or takes subject to the mortgage. The unam-

ortized costs need not, according to the Tax Court, be added to the cost of the property, thereby reducing gain on the sale. Reason is the fees and commissions represent the *use of borrowed money*. They are *not* part of the cost of the mortgaged property." (Emphasis in text)

*See, also, ibid.* at L–1515:

"Where the loan is prematurely discharged through prepayment of principal, it would appear that the entire unamortized balance of commissions or fees could be deducted in the year of discharge."

In *United States v. Memorial Corporation* (6th Cir. 1957) 244 F.2d 641, 644, however, the unamortized commission incurred in the sale of bonds was held to be "cha.geable to capital account and deductible * * * in arriving at long term capital gain." *See, however, Plaza Investment Co. v. Commissioner* (1945) 5 T.C. 1295, 1297. We do not regard *Memorial,* which involved a different state of facts, applicable here.