S & H, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 15997–79.     Filed February 16, 1982.

*Thomas A. Daily*, for the petitioner.
*Juandell D. Glass*, for the respondent.

DRENNEN, *Judge*: Respondent determined deficiencies in petitioner's Federal income tax in the amounts of $18,637,

$55,170, and $46,141 for the fiscal taxable years ending June 30, 1975, 1976, and 1977, respectively.

After concessions by both parties, the sole issue for decision is whether the income realized from the sale of a warehouse was capital gain or ordinary income, and if the former, the extent to which the gain qualified as long-term capital gain.

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioner S & H, Inc. (hereinafter S & H or petitioner), is an Arkansas corporation whose principal place of business was located in Fort Smith, Ark., at the time of filing the petition herein. For each of the taxable years in issue, petitioner filed a corporate income tax return with the Internal Revenue Service, Austin, Tex.

Petitioner was organized on July 14, 1961. Its primary business consisted of the acquisition and leasing or operation of Holiday Inn Motels and various other types of improved real property. As of the date of trial, petitioner owned 14 improved properties which it either operated itself or leased to others. These consisted of seven Holiday Inns, four post office buildings, two Pizza Inns, and one Trans Con truck terminal.

Some of these properties were already improved at the time they were acquired by petitioner, while others were improved by petitioner subsequent to their acquisition. In addition, certain lessees of the leased properties were granted options to purchase the leased property at the expiration of the lease term. The option price was at least equal to petitioner's cost for the land and improvements thereon.

In 1968, petitioner acquired 300 acres of unimproved land, known as the Whiteside Farm, in the Van Buren Industrial Park, Crawford County, Ark. Petitioner considered this land to be a good investment because an industrial park was being built adjacent to it, and because the land could be served by the Arkansas River and by an interstate highway. Other than certain portions of this land which have been sold by petitioner, as described below, the land is leased to a tenant farmer who pays petitioner $7,500 per year for the right to farm it.

In 1969, petitioner was approached by a mobile home

builder who wished to lease 12 acres of the Whiteside Farm and construct a building thereon. Petitioner agreed to lease the land as requested. The lessee ultimately defaulted on the lease and moved out. The building constructed by the lessee remained unoccupied for 1½ years, after which time it and the 12 acres on which it was located were sold to the Sigma Manufacturing Concern, which had initiated this purchase.

In 1968, petitioner sold 6 acres of the Whiteside Farm to the Coburn Manufacturing Co. This sale was initiated by Coburn.

Petitioner sold an additional 18 acres of the Whiteside Farm to Dr. Edwin Dooley in 1978. This sale was initiated by Dr. Dooley.

At no time did petitioner ever advertise any portion of the Whiteside Farm as being for sale. Petitioner has never listed this property for sale with a real estate agent or broker.

In 1973, representatives of the Griffin Grocery Co. (hereinafter Griffin) contacted petitioner concerning the purchase of 10 acres of the Whiteside Farm. As a result, for the price of $1,000, petitioner granted Griffin an option to buy 10 acres of the Whiteside Farm for $5,000 per acre. The option expired without being exercised. Thereafter, representatives of Griffin again contacted petitioner and proposed that petitioner construct a warehouse and various other improvements (hereinafter collectively referred to as the warehouse) on the 10 acres which Griffin would then lease from petitioner. Petitioner agreed.

Thereafter, petitioner and Griffin executed a document entitled "Agreement for Sublease" on May 10, 1974,[1] which provided, inter alia, that petitioner would construct a warehouse on a portion of the Whiteside Farm for Griffin's use and pursuant to Griffin's specifications, and that Griffin would be committed to sublease such warehouse and land upon completion of the construction.[2] This transaction was made specifical-

---

[1] This document superseded an agreement for sublease executed on Dec. 28, 1973.

[2] Griffin had the right to recommend contractors from whom bids would be requested, to review submitted bids, to evaluate the contractors and subcontractors who submitted bids, and to reject any or all bids so submitted. However, if Griffin rejected all the bids, petitioner could terminate the agreement. In such event, Griffin would be required to repay all "costs and expenses which have been reasonably incurred by * * * [petitioner] up to the date of such termination, including, without being limited to, architects' and engineers' fees,

ly contingent upon petitioner's obtaining financing for construction of the warehouse from the city of Van Buren (the city) through an industrial development revenue bond issue, pursuant to the Municipalities and Counties Industrial Development Bond Law.[3] Ark. Stat. Ann. secs. 13–1601 through 1605 (1960). The agreement for sublease also provided that Griffin's liability to petitioner for rent was not to begin until possession of the warehouse was given to Griffin. The term of this sublease was to begin on the first day of the first month on or after which the liability for rent commenced.

Petitioner was successful in obtaining industrial development revenue bond financing for construction of the warehouse. However, Arkansas State law required that the city hold title to the land on which the warehouse was to be built. Petitioner, therefore, transferred this title to the city, which in turn leased the property back to petitioner on June 1, 1974.[4] For this reason, petitioner subleased, rather than leased, the property to Griffin.

On May 10, 1974, petitioner and Griffin entered into a sublease agreement in respect of the portion of the Whiteside Farm whereon the warehouse was to be built. Pursuant to this agreement, Griffin was to sublease such land, including all the improvements located thereon, for a term of 20 years. However, the spaces provided for indicating the date of commencement of the term of this sublease and the monthly rental charge were left blank. The monthly rent was to be an amount equal to 1 percent of the cost of the land, site work, improvements, architects' and engineers' fees, premiums for lease insurance, and one-half of the cost of the construction of a railroad spur.[5] Griffin had an option to purchase the land and warehouse after the sublease had been in effect for 15 years,

attorneys' fees, all costs incurred in connection with arranging for the authorization and issuance of bonds, cost of holding the bond election, and any part of the nonrecoverable deposit on the premium for lease insurance which has been paid by * * * [petitioner]."

[3]Petitioner had the right to terminate the agreement if the bond issue did not pass, or if the bonds were not sold. In such event, Griffin was obligated to reimburse petitioner for all costs and expenses incurred up to the time of termination.

[4]The term of the lease was for 20 years, which corresponded with the term of the bond issue. Petitioner was to pay an average of approximately $203,000 per year as rent and had the option to acquire the property at the end of the lease for $100.

[5]It was intended by the parties that all costs incurred in constructing the warehouse and preparing it for occupancy would be included in the figure on which the rent was computed.

the purchase price to be essentially the balance of the monthly rental payments that would be paid over the remaining original term of the lease, plus 3⅜ percent. At the end of the 20-year term, Griffin could acquire this property without payment by merely notifying petitioner of its election to exercise its option.

Construction of the warehouse began on or about July 1, 1974. By December 31, 1974, petitioner had expended $1,325,225.04 for its construction.[6] This amounted to 60.02 percent of the total cost of construction. The warehouse was completed on or about July 1, 1975, which was the date the term of the sublease commenced. The monthly rent, however, was not calculated until 2 or 3 weeks later, when the total cost of construction had been determined. The monthly rent so calculated was $22,978.84.

During and after construction of the warehouse, petitioner characterized the transaction with Griffin on its books and records as a sublease. It capitalized and depreciated the warehouse and treated all income received from Griffin in respect of the sublease as rental income. However, during an audit of its tax returns for the taxable years 1975 and 1976, the auditing agent maintained that the sublease was, for tax purposes, a sale of the land and warehouse from petitioner to Griffin. Petitioner agreed, and subsequently, on its tax return for the taxable year 1977, it characterized the income received from Griffin as capital gain.

It was stipulated for trial that the transactions between petitioner and Griffin referred to in the agreement for sublease and sublease agreement of May 10, 1974, constituted for Federal tax purposes, an installment *sale* of the warehouse and land to Griffin by petitioner, for the total sales price of $3,269,250.[7] This price was allocated among land, building, and other improvements as follows:

---

[6]Petitioner did not act as a general contractor and did not exercise any direct supervision over construction of the warehouse, nor did it do so with respect to the construction of any of its other properties.

[7]Griffin was to pay petitioner a total of $5,514,921 over a 20-year period ($22,978.84 × 12 × 20). Since the stipulated sales price is $3,269,250, the remaining $2,245,671 is apparently interest.

| Item | Amount |
|---|---|
| Land | $128,115 |
| Building | 2,519,611 |
| Garage | 31,712 |
| Rent insurance | 184,712 |
| Refrigeration equipment | 344,579 |
| Rail spur | 60,481 |
| Total | 3,269,210 |

The total original cost to petitioner for the land was $90,000, and for the building and other improvements, $2,207,883.81.

On its income tax return for the taxable year ending June 30, 1976, petitioner reported the income received from Griffin was rental income,[8] and for the taxable year ending June 30, 1977, it reported the income as long-term capital gain.

Respondent determined that the income received during both of these years from the sale of the warehouse was reportable as ordinary income.

OPINION

The parties have stipulated that the transactions between S & H and Griffin referred to in the agreement for sublease and the sublease agreement, both dated May 10, 1974, constituted, for Federal tax purposes, a sale of the Van-Buren facilities to Griffin by S & H and that S & H is entitled to report the gain from the sale under the installment method of accounting. They have also stipulated that petitioner is entitled to report the gain from the sale of the *land* to Griffin as long-term capital gain. It is therefore unnecessary for us to decide whether the sublease agreement of May 10, 1974, was in fact a lease or a contract of sale.[9] The stipulations also appear to negate respondent's alternative argument, raised for the first

---

[8]It also took depreciation deductions and an investment tax credit with respect to the warehouse.

[9]It is respondent's position that the transaction between the city and petitioner was in substance no more than a financial arrangement whereby petitioner obtained the funds needed for construction of the warehouse and gave a deed to the land as security for the loan. Under this view, petitioner remained the owner of the property. Petitioner does not challenge this treatment, and we therefore need not decide the merits of respondent's position. See *Helvering v. Lazarus & Co.*, 308 U.S. 252 (1939); see also Rev. Rul. 68–590, 1968–2 C.B. 66.

time on brief, that petitioner's gain on the sale of the building and improvements was compensation for contracting services and for the use of money and thus subject to ordinary income treatment.

Therefore, the only issue for decision is whether the gain realized by petitioner on the sale of the warehouse to Griffin was capital gain or ordinary income. Resolution of the issue depends on whether the warehouse was either a capital asset within the meaning of section 1221,[10] or was property used in its trade or business so that the gain from its sale can be considered as gain from the sale of a capital asset pursuant to section 1231.

Petitioner asserts that the warehouse was held by it primarily to lease, not for sale to customers in the ordinary course of a trade or business. Furthermore, petitioner claims that the sale took place on July 1, 1975, and that as of 6 months and 1 day prior to that time (Dec. 31, 1974), the warehouse was 60.02-percent completed, and to this extent it is

---

[10]All section references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable years in issue. The pertinent parts of secs. 1221 and 1231 are as follows:

SEC. 1221. CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;

SEC. 1231. PROPERTY USED IN THE TRADE OR BUSINESS AND INVOLUNTARY CONVERSIONS.

(a) General Rule.—If * * * the recognized gains on sales or exchanges of property used in the trade or business * * * exceed the recognized losses from such sales * * * such gains * * * shall be considered as gains * * * from sales * * * of capital assets held for more than 6 months. * * *

\*     \*     \*     \*     \*     \*     \*

(b) Definition of Property Used in the Trade or Business.—For purposes of this section—

(1) General rule.—The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not—

(A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year,

(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business,

entitled to characterize the gain realized as long-term capital gain.[11]

Respondent asserts that the warehouse constituted property held primarily for sale to customers in the ordinary course of a trade or business, and the income from its sale is not, therefore, entitled to capital gains treatment. Specifically, he asserts that by contracting to have the warehouse built for and sold to Griffin, petitioner entered the trade or business of constructing or selling property. In support of this assertion, he maintains that the sale was pursuant to a preexisting arrangement to sell to a specific party, and that the profit received from the sale was not due to market appreciation in the value of the warehouse, but rather to activities on the part of petitioner, to wit, the construction of the warehouse. For the reasons stated herein, we agree with respondent and do not reach the merits of his alternative contention.

The income realized on the sale of the warehouse is entitled to capital gains treatment only if such warehouse was a capital asset within the meaning of section 1221 or if such income otherwise qualifies for capital gains treatment pursuant to section 1231. Generally speaking, section 1221 defines a capital asset as any property held by a taxpayer, with certain exceptions, one being property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, and another being property used in taxpayer's trade or business of a character which is subject to depreciation. Section 1231 specifically requires, under certain circumstances, that profits and losses recognized on the sale of property used by the taxpayer in a trade or business to be treated as capital gains and losses, even though the property was not otherwise a capital asset, but the definition of property used in the trade or business excludes property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Sec. 1231(b)(1)(B). (This type of property shall hereinafter be referred to as sec. 1231 property.) Both sections 1221 and 1231 specifically exclude from capital

---

[11]On its income tax return for the taxable year 1977, petitioner reported the entire amount received in respect of the sale as long-term capital gain. However, at trial and on brief, petitioner conceded that only 60.2 percent of the gain was long-term capital gain, the remainder being short-term capital gain. Respondent does not dispute petitioner's formula but does dispute its characterization of the gain.

gains treatment, inter alia, "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Secs. 1221(1) and 1231(b)(1)(B). Whether income from the sale of property is excluded from capital gains treatment is a question of fact, the burden of proof of which is on petitioner. Rule 142(a), Tax Court Rules of Practice and Procedure; *Welch v. Helvering*, 290 U.S. 111 (1933).

The capital gains exception to the normal tax rates is to be narrowly construed (*Corn Products Refining Co. v. Commissioner*, 350 U.S. 46, 52 (1955)) to effectuate the purpose of such exception of reducing the tax burden upon gains which have resulted from gradual appreciation over a long period of time. *Malat v. Riddell*, 383 U.S. 569, 572 (1966). Thus, the purpose of the exclusions provided in sections 1221(1) and 1231(b)(1)(B) is to "differentiate between gain derived from the everyday operations of a business and gain derived from assets that have appreciated in value over a substantial period of time." *McManus v. Commissioner*, 65 T.C. 197, 212 (1975), affd. 583 F.2d 443 (9th Cir. 1978).

Petitioner here contends that the warehouse was held primarily for lease. It supports this contention with the fact that the transfer was characterized in the agreements in respect of such transfer as a "sublease," and that petitioner indicated the transfer as a sublease on its books and records and income tax returns. In addition, petitioner points out that it was not until the time it was audited that it conceded to treat the transfer as a sale for Federal tax purposes.

The U.S. Supreme Court in *Malat v. Riddell, supra* at 572, defined the term "primarily" to mean "of first importance" or "principally." We think the facts here indicate that the warehouse was held "primarily" for sale to Griffin.

The parties have stipulated that the transaction between petitioner and Griffin referred to in the sublease agreement dated May 10, 1974, constituted a sale for Federal tax purposes. At the time this transaction took place, petitioner had not started construction of the warehouse and thus had no asset to sell. In the sublease agreement, petitioner agreed to construct the warehouse and turn it over to Griffin for its use. When the warehouse was completed, petitioner transferred possession thereof to Griffin in what the parties have characterized as a sale. Despite the terms of the sublease agreement,

petitioner's only purpose in constructing the building was to "sell" it to Griffin. Therefore, we conclude that petitioner held the warehouse primarily for sale.

Furthermore, we find that such sale was to a customer in the ordinary course of a trade or business of petitioner. Prior to the time of the sale in question, petitioner was engaged in the trade or business of acquiring and either operating or leasing similar types of improved real properties. True, the transaction with Griffin did not follow the usual pattern of petitioner's business. But that does not mean that the transaction was not a part of the same trade or business. Petitioner simply enlarged or modified its trade or business to include therein the construction and sale of improved real estate. Or, if the two types of transactions must be separated, petitioner simply entered a new trade or business in the transaction with Griffin. It is settled law that a taxpayer can be engaged in more than one business (*Curphey v. Commissioner*, 73 T.C. 766, 775 (1980), on appeal (9th Cir., Nov. 24, 1980)).

And it seems clear that Griffin was a customer of either petitioner's expanded business or its new business. The warehouse was built specifically for sale to Griffin, and the fact that Griffin was petitioner's only customer as of the time of the sale does not deny Griffin "customer" status. A restricted group of purchasers may qualify as customers and it has been said that in real estate transactions a sale to any purchaser is, in effect, a sale to a customer. *Pointer v. Commissioner*, 48 T.C. 906, 917 (1967).

In determining whether a taxpayer has engaged in a trade or business for purposes of section 1221(1) with respect to the sale of property, the focus must be on whether the taxpayer's efforts rise to the level of a trade or business. *Buono v. Commissioner*, 74 T.C. 187, 205 (1980). In resolving this question, courts have looked to numerous factors.[12] These factors, however, have varying degrees of relevancy depending

---

[12]These factors include, but are not limited to, the nature and purpose of the acquisition of the property and the duration of the ownership; the extent and nature of the taxpayer's efforts to sell the property; the number, extent, continuity, and substantiality of sales; the extent of subdividing, developing, and advertising to increase sales; the use of a business office for the sale of the property; the character and degree of supervision or control exercised by the taxpayer over the representative selling the property; and the time and effort the taxpayer habitually devoted to the sale. *Buono v. Commissioner*, 74 T.C. 187, 199 (1980); *United States v. Winthrop*, 417 F.2d 905 (5th Cir. 1969).

on the particular factual situation, and all may not be applicable to any given case. *Buono v. Commissioner, supra* at 199; see, e.g., *Brady v. Commissioner,* 25 T.C. 682 (1955). We do not believe many of those factors are relevant in this case. Moreover, they are by no means intended to impart a "one-bite" rule, such that a taxpayer who engaged only in one venture or one sale cannot under any circumstances be held to be in a trade or business as to that venture or sale.[13] See *Zack v. Commissioner,* 25 T.C. 676 (1955), affd. per curiam 245 F.2d 235 (6th Cir. 1957); *Brady v. Commissioner, supra.* Indeed, a single venture involving the sale of property may constitute a trade or business with respect to that sale if the property was acquired pursuant to a preexisting arrangement to sell to a specific party upon its acquisition. See *DeMars v. United States,* an unreported case (S.D. Ind. 1971, 27 AFTR 2d 71–925, 71–1 USTC par. 9288) wherein under facts very similar to those in this case, it was said: "property acquired [in a single venture] for the purpose of sale to a specific party pursuant to a pre-existing arrangement constitutes property held for sale in the ordinary course of a trade or business"; cf. *Currie v. Commissioner,* 53 T.C. 185 (1969).

Similarly, in the instant case, the property was constructed with the specific intent to transfer it, pursuant to a preexisting arrangement, to a specific party who was committed to take such property. If the May 10, 1974, agreement was a sale, the warehouse cannot be said to have ever been held by petitioner passively for investment or for long-term appreciation in value. To the contrary, there was a definite and continuing and active plan to construct and transfer (sell) the property to Griffin as soon as it was completed, and that was done. We think that this activity, under the circumstances herein, constituted a trade or business for purposes of sections 1221(1) and 1231(b)(1)(B). The profit received from this sale is not the type which Congress intended to remove from the normal tax requirements of the Internal Revenue Code (see *Corn Products Refining Co. v. Commissioner, supra*), but, rather, falls within the purview of sections 1221(1) and 1231(b)(1)(B). See *McManus v. Commissioner, supra.*

---

[13]But see Saunders, " 'Trade or Business,' Its Meaning Under the Internal Revenue Code," U. So. Cal. 12th Inst. on Fed. Tax. 693, 720 (1960).

The case on which petitioner has primarily relied is *Commissioner v. Williams*, 256 F.2d 152 (5th Cir. 1958), revg. a Memorandum Opinion of this Court. In that case, the taxpayer purchased a partially completed Navy tankship which he hoped to complete and sell for a profit. However, at the time the taxpayer purchased the tankship, he did not have a preexisting arrangement with a specific party to purchase the tankship upon its completion. The Court of Appeals found that the eventual sale of the tankship was a "non-recurring speculative venture," *Commissioner v. Williams, supra* at 155, and, therefore, held that it did not constitute a trade or business.

It is obvious to us that the instant case is factually distinguishable from the *Williams* case. Here, the warehouse was built specifically for Griffin pursuant to its plans and specifications. On May 10, 1974, when petitioner became contractually obligated to build the warehouse and Griffin became contractually obligated to accept it, construction of the warehouse had not yet begun. Thus, there was clearly a preexisting arrangement for transfer of the property to a specific party, who was committed to take it.

Furthermore, unlike the transaction involved in *Commissioner v. Williams, supra*, the transaction herein cannot be viewed as a "speculative venture." The agreement for sublease provided that Griffin was "committed to sublease" (purchase) the warehouse once it was completed. Only petitioner had the right, under certain circumstances, to terminate the agreement, in which event Griffin was obligated to reimburse petitioner for all costs and expenses incurred up to the time of such termination. Further, the sales price herein was not determined until petitioner's total cost of construction could be calculated, thus insuring that petitioner would reap a profit on the sale.

Accordingly, in view of the above and the record as a whole, we conclude that the gain realized by petitioner from the sale of the warehouse was taxable as ordinary income and not as capital gain.[14]

---

[14]If, as the parties have stipulated, the sublease agreement dated May 10, 1974, constituted a sale of the warehouse, we fail to understand how petitioner would be entitled

Because of concessions by both parties,

*Decision will be entered under Rule 155.*

to long-term capital gain on the transaction even if the warehouse was a capital asset. Petitioner "sold" the asset before it came into existence and could not have held it for more than 6 months prior to the sale.