E. DEAN MORLEY AND MERRY MORLEY, PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 40685-84.     Filed November 19, 1986.

*John P. Dedon, James B. Pittleman,* and *Dexter S. Odin,*
for the petitioners.
*Clement Shugerman,* for the respondent.

TANNENWALD, *Judge*: Respondent determined deficiencies
in petitioners' Federal income tax in the amounts of
$28,006.59 for the taxable year ended December 31, 1980,
and $19,827.84 for the taxable year ended December 31,
1981. After concessions by the parties, the sole issue for
decision is whether interest paid by petitioners constituted
"investment interest," the deductibility of which is limited
under section 163(d).[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found.
This reference incorporates the stipulation of facts and
attached exhibits.

Petitioners husband and wife resided in McLean, Virginia,
at the time they filed the petition in this case. They timely
filed joint Federal income tax returns for the taxable years
ended December 31, 1980, and December 31, 1981, with the
Internal Revenue Service Center, Memphis, Tennessee.

Since 1961, petitioner E. Dean Morley (Morley) has been
engaged in the trade or business of selling real estate for
commission as a broker in the Northern Virginia area.

---

[1]All section references are to the Internal Revenue Code of 1954 as amended and in effect
during the years in issue, and all Rule references are to the Tax Court Rules of Practice and
Procedure.

On September 17, 1973, Morley entered into a contingent contract with Minnieville Development Corp. (Minnieville) for the purchase of approximately 180 acres of property located in Prince William County, Virginia, known as the "Elm Farm Property" (Elm Farm).

By the terms of the September 17, 1973, contract Morley would deposit $10,000 in escrow, and would have the right within 2 months to conduct feasibility studies. If those studies did not indicate "in Purchaser's sole opinion" that the property was suitable for his proposed development, then Morley would have the right to terminate the contract and receive a refund of the $10,000 deposit. The contract further provided that "Time is of the essence." It set the settlement date on or before December 15, 1973, but also provided that, if Morley failed to make settlement, he would lose only the cash deposit. The total price of the property was $2,500,000, $600,000 of which was payable at settlement, and the remainder of which was payable in notes, including the assumption of a $1,500,000 first deed of trust.

Morley did not have a particular repurchaser in mind at the time he entered into the contingent contract with Minnieville, but he intended promptly to attempt to resell Elm Farm if he purchased it. Morley had not previously engaged in the purchase and sale of real property for his own account.

Sometime after September 17, 1973, Morley sent to John Pflug (hereinafter Pflug) a contract for the sale of Elm Farm. The total sales price set forth in the contract was $4,800,000 payable as follows:

(a) A deposit of $25,000 into escrow;

(b) $700,000 in cash at the time of settlement;

(c) Assumption of the $1,500,000 first deed of trust note;

(d) Assumption of a $400,000 second deed of trust note, which Morley was required to give at a closing of the contract with Minnieville; and

(e) Giving of a $2,200,000 third deed of trust note.

The proposed contract gave Pflug the right, within 60 days of acceptance, to conduct feasibility studies and, if in his "sole opinion" the property was not suitable, he would have the right to terminate the contract and receive back the $25,000 deposit. For 30 days after the expiration of the

60-day period, Pflug was given the right to avoid settlement by forfeiting the $25,000 deposit.

Morley at the time was aware that Pflug was a developer of commercial, and not residential, realty, but he understood that Pflug was planning to enter into residential develop-ment activity by way of a joint venture with a major residential developer.

On December 15, 1973, United Virginia Bank loaned Morley $600,000 to close on the purchase of Elm Farm.

On December 17, 1973, petitioners formed Jerdardt Asso-ciates Partnership (Jerdardt) in which each petitioner held a 50-percent interest. Petitioners intended that Jerdardt would be a vehicle for the purchase and sale of other properties and formed Jerdardt to avoid the necessity of Morley's obtaining Mrs. Morley's signature on real estate transactions.

On December 17, 1973, Elm Farm was conveyed to Dean Morley, Trustee, on behalf of Jerdardt for a total purchase price of $2,500,000 payable as follows:

| | |
|---|---|
| Assumption of deed of trust | $1,500,000 |
| Second trust to Minnieville | 400,000 |
| Cash | 600,000 |

Morley and Pflug were in contact with each other about the sale of Elm Farm to Pflug during the period from September 1973 to February 1974. Pflug sent Morley a sales contract, dated February 1, 1974, for the purchase of Elm Farm, which he had signed and which had space for Morley's signature as trustee for Jerdardt. Under the terms of that contract, the purchase price of Elm Farm was $2,500 per dwelling unit multiplied by the number of dwelling units (estimated to be 1,200) authorized to be constructed upon the property by local officials. Pflug would have 90 days to conduct feasibility studies during which period he could determine "in his sole discretion" that it was not "feasible or desirable" to develop the property, in which case he would have the—

unqualified right, exercisable in his sole discretion, and exercisable whether or not in fact he has received written reports of or procured the making of such surveys, tests or investigations, to terminate this contract * * * in which event the deposit shall be refunded to Purchaser

forthwith, and the parties shall have no further obligation each to the other hereunder. * * *

The sum of $300,000 would be paid in cash at settlement, a portion of the other deeds of trust upon the property would be assumed, and the balance of the purchase price for the first phase of the development would be paid by a deferred purchase money note. After the completion of the first phase, new purchases would be made of each additional phase, on similar terms as for the first phase.

Morley found Pflug's price, and some of the other terms of the Pflug contract, unacceptable, but he believed that the gaps between his terms and those of Pflug could be resolved through further negotiations. At all times pertinent herein, Morley believed that he and Pflug could negotiate terms of sale acceptable to both. At no time during 1973 or 1974 did Morley have sufficient current assets available with which to carry Elm Farm for any significant period prior to a sale.

Subsequent to February 1974, the real estate market went into a very severe recession. Pflug terminated negotiations with Morley for the purchase of Elm Farm because of the collapse of the real estate market and the unwillingness of his contemplated coventurer to proceed with the development of the property. Because of the real estate collapse, Morley was unsuccessful in his attempts to sell Elm Farm to other purchasers although he attempted to do so. For the same reason, Jerdardt was unable to carry out its contemplated activities in respect of other real estate transactions.

Because petitioners lacked the financial capabilities to service the debt on the property, Elm Farm was foreclosed except for 14 acres which were released from the two deeds of trust. These 14 acres have not been sold or in any way developed by Morley.

On July 30, 1974, prior to the foreclosure, United Virginia Bank obtained as security for the obligations owed to that bank by Morley the 14 acres of Elm Farm property, as well as other property owned by Morley and commissions and sales proceeds expected by Morley.

Interest on the $600,000 loan continued to accrue, and in 1980 and 1981, Morley paid interest to United Virginia Bank in connection with that loan of $241,594.25 and

$196,257.90, respectively, all of which Morley deducted on his 1980 and 1981 returns.

On April 9, 1973, Morley executed a sales contract for the purchase of 25 acres of land in Fairfax County, Virginia, known, and hereinafter referred to, as McLean Station. On June 9, 1976, Morley refinanced McLean Station with a loan from United Savings & Loan Association with Morley putting up no cash towards the refinancing. In December 1977, McLean Station was sold. Morley reported his share of the gain on his Federal income tax returns as capital gain using the installment method of reporting.

## OPINION

The sole issue before us for decision is whether interest paid by petitioners in 1980 and 1981, on an indebtedness in respect of Elm Farm, constituted "investment interest" within the meaning of section 163(d)(3)(D) which provides, insofar as it is pertinent to the instant case, that "The term 'investment interest' means interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment." In such event, the limitations of section 163(d)(1) apply. Petitioners contend that, since petitioners acquired Elm Farm with the intention of promptly reselling it, and since they immediately engaged in bona fide negotiations with a prospective purchaser (Pflug), the interest in question was not "investment interest." Respondent counters with the argument that, in the absence of a prior binding commitment from a prospective purchaser at the time of petitioners' acquisition, Elm Farm was bought for investment and therefore the interest in question was "investment interest." In support of his argument, respondent questions the bona fides of the negotiations with Pflug.[2]

Both parties discuss at length *S & H, Inc. v. Commissioner*, 78 T.C. 234 (1982). In that case, the issue before us was whether the sale of property and a warehouse which taxpayer built thereon, to a purchaser pursuant to a prior

---

[2]At no time does respondent argue that, even if Elm Farm was not "property held for investment" at the time of its acquisition by petitioners in 1973, it constituted such property during 1980 and 1981, the years at issue herein. In so noting, we add that we do not express any opinion on the validity of such an argument.

binding agreement of purchase and sale, resulted in capital gain or ordinary income. We held that the transaction was a sale of property in the ordinary course of taxpayer's business and that the gain therefrom was ordinary income. In so holding, we rejected the so-called "one-bite" rule to the extent that such rule established that "a taxpayer who engaged only in one venture or one sale cannot under any circumstances be held to be in a trade or business as to that venture or sale." See 78 T.C. at 244.[3]

Respondent insists that the rationale of *S & H, Inc.* is applicable only where the taxpayer has a prior binding commitment to sell at the time of acquisition. Petitioners contend that the holding of *S & H, Inc.* should not be so confined and should extend to situations where there is clear objective evidence of a contemporaneous intent promptly to sell the property being acquired. We agree with petitioners.

Just as we rejected the so-called "one-bite" rule in *S & H, Inc. v. Commissioner, supra*, as an absolute tenet of decision, so we reject respondent's attempt to restrict our decision therein to cases where there is a binding prior commitment to sell the property at the time of acquisition by the taxpayer. Rather, we think that the rationale of *S & H, Inc.*, should be applied to situations where, at the time the property was acquired by the taxpayer, he intended promptly to resell the property *and* the objective facts show that he proceeded to attempt to implement that intent—in short, that the taxpayer's purpose was bona fide. We think the actions of petitioners herein meet this standard.

We see no point in reviewing all the elements set forth in our findings of fact which lead us to this conclusion. It is

---

[3]In *Reese v. Commissioner*, 615 F.2d 226 (5th Cir. 1980), affg. a Memorandum Opinion of this Court (a case clearly distinguishable from the instant case on its facts), the Fifth Circuit Court of Appeals generally adopted the "one-bite" rule as follows:

"We reject taxpayers' contention. While there may perhaps be extraordinary circumstances in which a taxpayer's devotion of time and resources to a non-recurring venture constitutes a trade or business,[6] a single transaction ordinarily will not constitute a trade or business when the taxpayer enters into the transaction with no expectation of continuing in the field of endeavor. * * * [615 F.2d at 230-231.]"

---

[6]"Conceivably, a single endeavor could rise to the level of a trade or business where the taxpayer, at the time he entered into it, fully expected the transaction to be but the first of many and was prevented, for one reason or another, from continuing in the business. Such a situation, however, does not exist here."

enough to note that negotiations between Morley and Pflug commenced while Morley only had an option to acquire Elm Farm, and that such negotiations produced a proposed written contract at an early point in time. We recognize that the contract, which Morley sent Pflug, contained a price of $4,800,000 which, on its face, seems far out of line based on Morley's $2,500,000 purchase price. But we are satisfied that this represented, at worst, a bargaining stance on Morley's part, and it is obvious that Pflug did not consider the price so out of line as to preclude a further proposal on his part. To be sure, Pflug's counter proposal was at a very much lower figure ($3,000,000), but we are satisfied that this proposal similarly represented a bargaining stance on Pflug's part. The fact of the matter is that the record herein reveals that both Morley and Pflug were clearly interested in arriving at a deal[4] and that considerations beyond the control of either of them precluded them from achieving their objective. Pflug dropped out because of the change of heart of his anticipated coventurer and the impact of the deterioration of the real estate market. When this happened, Morley was effectually left high and dry because of the condition of the real estate market and his lack of the necessary financial resources to continue to carry Elm Farm until another purchaser could be found. In this latter connection, we do not share respondent's view that, because Morley's financial statements showed a substantial net worth, he had such financial resources. The overwhelming bulk of Morley's net worth was in nonliquid assets, principally real estate; such assets do not provide the wherewithal to cover the carrying charges which attached to Elm Farm.

Nor are we persuaded that such resources were so clearly available from the future settlement on the sale of McLean Station to negate our conclusion as to Morley's available financial resources. We also note that, contrary to respondent, we attach little significance to the fact that petitioners reported the sale of McLean Station as long-term capital gain is so inconsistent with petitioners' position in respect

---

[4]We note that a United Virginia Bank official testified that the bank was satisfied that a deal between Morley and Pflug was in the offing when the bank advanced the funds to enable Morley to close the purchase of Elm Farm.

of Elm Farm as to undermine their position herein. The circumstances involving the acquisition and disposition of McLean Station were significantly different from those involving Elm Farm.

As we stated in *S & H, Inc. v. Commissioner, supra* at 243-244, numerous factors are involved in determining whether a taxpayer engaged in a trade or business, but "These factors * * * have varying degrees of relevancy depending on the particular factual situation, and all may not be applicable to any given case." We have followed this path and hold on the basis of the entire record, including the testimony of the witnesses whom we saw and heard, that petitioners were so engaged in respect of Elm Farm. As a consequence, the interest in question is not "investment interest" within the meaning of section 163(d)(3)(D), and petitioners' deductions are allowable.

In view of our holding, we need not address petitioners' further argument that their activities in respect of Elm Farm were merely an extension of Morley's real estate brokerage business. See *Malmstedt v. Commissioner*, 578 F.2d 520 (4th Cir. 1978), revg. and remanding a Memorandum Opinion of this Court; *S & H, Inc. v. Commissioner, supra* at 243; *Baumgart v. Commissioner*, T.C. Memo. 1983-738.

*Decision will be entered under Rule 155.*