JAMES E. and BARBARA HOUSTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Houston v. Commissioner
Docket No. 2224-87.
United States Tax Court
T.C. Memo 1989-175; 1989 Tax Ct. Memo LEXIS 166; 57 T.C.M. (CCH) 156; T.C.M. (RIA) 89175; April 18, 1989. W. Dick Coombs, for the petitioner. John H. Gadon, for the respondent. WHALEN
MEMORANDUM FINDINGS OF FACT AND OPINION WHALEN, Judge: The Commissioner determined a deficiency of $ 33,078.47 in petitioners' 1981 Federal income tax. The sole issue is whether the amount paid by petitioners during such year as interest on indebtedness is deductible in full under section 162[1] or section 163(a), as petitioners contend, or whether such amount constitutes "investment interest" within the meaning section 163(d) and is, accordingly, *168 subject to the limitations on deduction set out in that subsection, as respondent contends. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in Akron, Ohio at the time the petition was filed. Petitioner, Mr. James E. Houston (hereinafter sometimes referred to as "petitioner"), has been employed as an independent insurance agent, since approximately 1964. In 1975, he became acquainted with Mr. James D. Bell, II, and other individuals who sought to purchase the outstanding stock of a publicly traded company, Portage Industries Corporation (Portage). Portage was a holding company whose sole business was conducted by its wholly owned subsidiary, Portage Machine Company (Portage Machine). Portage Machine designed, manufactured, and sold machine tools, special-order machines, and quality control equipment, and rebuilt special machinery and tools. Petitioner, Mr. Bell and others formed a group, "the Bell Group," which undertook to acquire control *169 of the stock of Portage. With that objective in mind, the members of the group entered into an agreement among themselves dated July 23, 1975, to govern the contribution each would make to the enterprise and the interest in Portage which each would receive if they were successful. Pursuant to such agreement, petitioner agreed to make a cash contribution of $ 150,000 in return for a 25 percent equity interest in Portage. Mr. Bell agreed to contribute cash of $ 100,000, along with 50,000 shares of Portage common stock which he already owned and certain promissory notes, in return for a 50 percent equity interest in Portage. The July 23, 1975, agreement also provided that Portage's Articles of Incorporation would be amended to provide that all items requiring shareholder approval would require a vote of at least 80 percent of the outstanding shares of Portage. Petitioner considered this provision an important protection of his minority interest, and he would not have agreed to purchase Portage stock without it. As a further inducement for petitioner to enter into the July 23, 1975 agreement, Mr. Bell agreed in a letter to petitioner of the same date that Mr. Bell would cause Portage *170 to pay salaries and/or commissions to petitioner of a minimum of $ 30,000.00 per year for a period of 5 years, payable monthly beginning September 1, 1975, and to place Portage's insurance business with petitioner's insurance agency, provided that the price was reasonably competitive. This letter agreement was a necessary condition of petitioner's purchase of Portage stock. Mr. Bell and petitioner viewed the letter agreement as a guarantee that petitioner would, at a minimum, recoup his entire investment in the Portage stock over the 5-year period. The Bell group was successful in acquiring control of Portage and petitioner made the cash contribution required of him by the July 23, 1975, agreement. Petitioner had no experience in the tool and machine manufacturing business prior to his involvement with Portage. He invested in Portage stock in 1975 because he had confidence in Mr. Bell's ability to operate the company and he believed that he would be able to recoup his investment in Portage stock through Mr. Bell's personal guarantee, described above, and that such investment carried minimum risk. In July of 1976, petitioner and Mr. Bell formed an Ohio partnership under the *171 name of Bell-Houston Company. The partnership acquired and leased land and a building to the operating company, Portage Machine, for use in its business operations. The partnership acquired the land and building for $ 700,000 and leased it to Portage Machine for $ 8,100 per month. From 1975 to February 1977, Mr. Bell was the president of Portage Machine and chairman of the board of directors of Portage. During this period, petitioner continued to work full-time as an insurance agent, and played no role in the management of Portage. During this time, Portage's name was changed to Sweitzer Holdings, Inc.
In February 1977, Mr. Bell was indicted on numerous criminal charges unrelated to the issues in this case. Ultimately, he was convicted and sent to prison. Upon learning of Mr. Bell's indictment, petitioner feared the possible loss of business by Portage Machine. He acted quickly to assume control of the company and was named to replace Mr. Bell as head of the company. Soon thereafter, petitioner also purchased Mr. Bell's entire interest in the stock of Portage, consisting of common stock and series A and B preferred stock, which was then held by the Bell Group under the July 23, 1975 Agreement. *172 In order to protect his investment in Portage, petitioner borrowed $ 400,000 and paid such amount to Mr. Bell for Mr. Bell's interest in the Portage stock. Petitioner also assumed certain advances and loans to Mr. Bell which were outstanding on the books of Portage and its subsidiary in the amount of approximately $ 72,500 and he assumed another loan to Mr. Bell from a third party in the amount of $ 7,500. After the purchase, Mr. Houston owned more than 50 percent of the stock of the holding company. The certificates representing the shares of Portage stock which petitioner purchased from Mr. Bell bore a legend on their face reciting, among other things, that "the shares have been acquired for investment * * *." The legend was required under Federal and State securities laws. At the time he acquired the Portage stock from Mr. Bell, petitioner predicted greater growth for its subsidiary. During an interview with a newspaper reporter, petitioner noted that company sales were projected to be $ 7.5 million, an increase over the prior year sales, $ 5 million. Petitioner's projection was even more optimistic. He stated, "I think the company is a sleeping giant * * *." He told the *173 reporter that the company had "the capability within our own people to move to $ 8.5 million to $ 12 million in sales a year." Simultaneous with his purchase of Portage stock from Mr. Bell, petitioner also purchased Mr. Bell's interest in the Bell-Houston partnership. He thereby effectively became the owner of the Portage Machine land and building and he continued to lease the land and building to Portage Machine. Petitioner purchased Mr. Bell's stock because he felt that Portage Machine could at least maintain and possibly improve its financial position, that Portage Machine was a sound business, that he would be able at a minimum to recoup his investment through salaries, and perhaps receive more. After he purchased the holding company's stock from Mr. Bell, petitioner owned a controlling interest in the company. As president and chairman of Portage's board of directors, petitioner relied upon the company's managerial staff for the day-to-day operation of the company. He held almost daily meetings with them for a long period in order to acquaint himself with the company's operations. From 1977 to 1982, petitioner continued to work and earn substantial commissions as an *174 insurance agent. The July 1975 letter agreement, by which Mr. Bell agreed to cause Portage to pay Mr. Houston a minimum of $ 30,000 per year in salaries and/or commissions, was honored until 1977 when Mr. Houston took control of Portage. The record does not reveal exactly how much money Portage paid petitioner in 1975 and 1976. Petitioners' 1975 and 1976 Federal income tax returns report no salary from Portage. After assuming control of Portage, Mr. Houston began receiving salaries which totaled more than $ 500,000 from 1977 through 1982. During this time, some part of Portage's insurance business was placed through petitioner's insurance agency. The record does not reveal the extent to which petitioner profited from such business. In 1982, Mr. Houston sold all of his Portage stock and the land and building occupied by Portage Machine, to the Phillips Group. The sales price of the stock was $ 505,000. On their 1982 Federal income tax return, petitioners combined the sales of Portage stock and the land and building. They reported a combined long-term capital gain from the two transactions in the amount of $ 5,918.73. During 1981, petitioners paid $ 93,915.22 in interest *175 on the $ 400,000 indebtedness which Mr. Houston incurred in 1977 to purchase Mr. Bell's stock in Portage. Petitioners reported such amount as "interest on business indebtedness" on Schedule C of their 1981 Federal Income Tax return, thereby deducting the entire amount from their gross income. In his statutory notice of deficiency, the Commissioner determined as follows: The investment interest of $ 93,915.22 deducted on your 1981 return on Schedule C is disallowed as an ordinary and necessary business expense and allowed as an itemized interest deduction to the extent of $ 27,511.50. Investment interest is limited under Internal Revenue Code Section 163 as follows: Net investment income
$  2,511.50
Section 163(d) limitation
$ 10,000.00
Section 163(d) (7) additional allowance
for majority ownership
$ 15,000.00
Total
$ 27,511.50
OPINION Petitioner borrowed $ 400,000 in 1977 to purchase stock in a publicly traded company. The sole issue in this case concerns the deductibility of $ 93,915.22, paid by petitioners in 1981 as interest on the loan. Respondent says that the stock constitutes "property held for investment" within *176 the meaning of section 163(d)(3)(D), so that the interest paid on the loan in 1981 falls within the definition of "investment interest" and is not fully deductible in that year. Petitioners say that Mr. Houston's purchase of Portage stock in 1977 was necessary to assure the continuation of the company and petitioner's business relation with it and, hence, the stock did not constitute "property held for investment" in his hands. During the year at issue, section 163(d) provided, in part, as follows: (1) IN GENERAL. -- In the case of a taxpayer other than a corporation, the amount of investment interest (as defined in paragraph (3)(D)) otherwise allowable as a deduction under this chapter shall be limited, in the following order, to -- (A) $ 10,000 * * *, plus (B) the amount of the net investment income * * *. * * * (3) DEFINITIONS.-For purposes of this subsection -- * * * (D) INVESTMENT INTEREST. -- The term "investment interest" means interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment. * * * The above phrase, *177 "property held for investment," is not defined by the statute or the regulations promulgated thereunder. However, the legislative history of section 163(d), enacted as part of the Tax Reform Act of 1969, Pub. L. 91-172, § 221, 83 Stat. 487, 574, makes clear what is implicit from the words themselves, that the phrase does not include property used in the taxpayer's trade or business, such as plant, equipment and inventory, nor does it include property acquired for personal use, such as the family residence or automobile. H. Rept. 91-413 (Part 1) (1969), 1969-3 C.B. 200, 246. The legislative history describes the abuse to which section 163(d) was directed in the following terms: The itemized deduction presently allowed individuals for interest, makes it possible for taxpayers to voluntarily incur substantial interest expenses on funds borrowed to acquire or carry investment assets. Where the interest expense exceeds the taxpayer's investment income, it, in effect, is used to insulate other income from taxation. For example a taxpayer may borrow substantial amounts to purchase *178 stocks which have growth potential but which return small dividends currently. Despite the fact that the receipt of the income from the investment may be postponed (and may be capital gains), the taxpayer will receive a current deduction for the interest expense even though it is substantially in excess of the income from the investment. [H. Rept. 91-413 (Part 1) (1969), 1969-3 C.B. 200, 245.] The cases decided by this Court under section 163(d) typically have involved a taxpayer's contention -- like petitioners' contention in this case -- that the interest at issue financed the acquisition of business, as opposed to investment, property. We have distinguished investment property from business property, for purposes of section 163(d), based upon the presence or lack of "substantial investment intent." Polakis v. Commissioner,91 T.C. 660, 668 n.8 (1988); Miller v. Commissioner,70 T.C. 448 (1978). Under that test, property is treated as investment property for purposes of section 163(d) if the taxpayer acquired or held it with a substantial *179 investment intent. Even if the taxpayer also had a business purpose and even if such business purpose was the predominant reason for acquiring or holding the asset, the property is nevertheless classified as "property held for investment." Recklitis v. Commissioner,91 T.C. 874, 907 (1988). For example, we have resolved some cases for the Commissioner on the ground that the taxpayer's activities clearly did not amount to the conduct of a trade or business, e.g., Polakis v. Commissioner, supra;Estate of Yaeger v. Commissioner,T.C. Memo. 1988-264; Paoli v. Commissioner,T.C. Memo. 1988-23; Asch v. Commissioner,T.C. Memo. 1986-238, or where it was clear that acquisition of the property was substantially for investment purposes, Recklitis v. Commissioner, supra. We have resolved other cases for the taxpayer on the ground that his acquisition of the subject property was clearly only for business purposes or on the ground that the taxpayer had no substantial investment motive. E.g., King v. Commissioner,89 T.C. 445 (1987); Morley v. Commissioner,87 T.C. 1206 (1986); *180 Boseker v. Commissioner,T.C. Memo. 1986-353. Some cases have presented more difficult factual issues because of the mixed business and investment motives of the taxpayer for the acquisition and/or continuation of ownership of the property. Miller v. Commissioner, supra;Schanhofer v. Commissioner,T.C. Memo. 1986-166. We adopted the substantial investment motive test for purposes of section 163(d) in Miller v. Commissioner, supra. Actually, the issue in Miller involved the application of the minimum tax on "investment interest expense" under former section 56 but, as we have since noted, its definition of investment property is the same as under section 163(d). King v. Commissioner, supra at 461 n.10; Boseker v. Commissioner, supra.A full discussion of our decision in Miller is appropriate in order to better understand the issue in this case and our resolution of it. The property at issue in Miller consisted of the common stock of a bank corporation, that is, property which is usually held as investment property. The taxpayer had realized a substantial profit *181 on the sale of the bank stock and had reported the profit as long-term capital gain. Nevertheless, for purposes of section 163(d), the taxpayer claimed that the stock was not investment property but was property held in connection with his banking business under the Supreme Court's decision in Corn Products Refining Co. v. Commissioner,350 U.S. 46 (1955). In effect, the taxpayer treated the bank stock as a so-called ordinary asset under the Corn Products doctrine for purposes of deducting the interest under section 163(d) but treated the stock as a capital asset, not subject to the Corn Products exception, when it came time to report the gain from the sale. Thus, the taxpayer wanted "to have his cake and eat it too." At the time Miller was decided , this Court had already adopted the substantial investment motive test to determine whether an asset, such as corporate stock of a kind which is normally a capital asset, was so closely related to the taxpayer's business as to constitute a non-capital asset under the Supreme Court's opinion in Corn Products. W. W. Windle Co. v. Commissioner,65 T.C. 694 (1976). We had adopted the substantial *182 investment motive test in that context in order to prevent the expansion of the Corn Products doctrine, "a judge-made addition to the statutory categories of non-capital assets," and to limit the "gray area of uncertainty and controversy" which would be brought about thereby. W. W. Windle Co. v. Commissioner, supra at 712-13. The issue for decision in Miller, whether the taxpayer's bank stock was investment property for purposes of section 163(d), was the same as the underlying issue, whether the bank stock constituted a capital asset. At that time, it was thought that the answer to both issues depended upon whether the bank stock was so closely related to the taxpayer's business as to constitute a non-capital asset under the Corn Products doctrine. Accordingly, we applied the same test to answer the first question as had been applied to answer the second. Miller v. Commissioner, supra at 455. Our decision in Miller does not mean that every capital asset is automatically covered by section 163(d). King v. Commissioner,89 T.C. 445, 462 (1987). In King, we made it clear that the Court had not adopted any *183 such per se test. Also, Polakis v. Commissioner, supra at 672. King involved the deductibility of interest paid by a trader of commodity futures on indebtedness incurred in connection with ordinary trading activities. We held that the interest was part of the taxpayer's trade or business and was not subject to section 163(d), despite the fact that the taxpayer's trade or business produced capital gains and losses rather than ordinary income. We rejected respondent's argument that our opinion in Miller required section 163(d) to be applied whenever the sale of the subject property produced capital gains or losses. We stated the following: Under the factual scenario in Miller, whether the taxpayer therein could properly claim capital gains treatment was synonymous with whether the taxpayer held the property for investment. * * * Our holding in Miller is limited to the factual situation involved therein, i.e., a taxpayer attempting to prove that stock is not held for investment due to the application of the doctrine set forth in Corn Products Refining Co. v. Commissioner, supra.[11]
*184 King v. Commissioner, supra at 462 and n.11. In this case, both parties are dissatisfied with the substantial investment motive test and argue for the application of a different standard. Petitioners argue that a taxpayer's "predominant intention" should be used to distinguish between business and investment property for purposes of section 163(d) and that petitioner's dominant motive was business related. Respondent argues, on the other hand, that petitioner's motives for acquiring Portage stock are irrelevant in this case because the stock was a capital asset in his hands and is automatically "property held for investment" without any consideration of his motives. According to respondent, we adopted a per se rule in Miller, under which capital assets are automatically treated as "property held for investment" for purposes of section 163(d). In respondent's view, the decision of the United States Supreme Court in Arkansas Best Corp. v. Commissioner,    U.S.    (1988), affg. 800 F.2d 215 (8th Cir. 1986), makes petitioner's business motivation in acquiring Portage stock irrelevant in determining whether the stock constitutes *185 a capital asset in his hands. Therefore, respondent argues, petitioner's motives are irrelevant for purposes of section 163(d). According to respondent, petitioners have the burden of proving that the Portage stock does not constitute a capital asset in Mr. Houston's hands because, otherwise, the interest paid to finance his acquisition of such stock is automatically treated as investment interest. We do not agree with the position of either of the parties. Turning first to respondent's position, we once again reject the argument that section 163(d) is automatically applicable to interest incurred to finance the acquisition of a capital asset. While there is a rough correlation between "property held for investment" under section 163(d) and the definition of capital asset in section 1221, the two concepts are not identical, as we pointed out in the above-quoted passage from our opinion in King. For example, if property falls outside of the definition of capital asset because it is described in one of the enumerated exceptions in section 1221, it will most likely also fall outside of the definition of "property held for investment." The reverse, however, is not necessarily *186 true. Some capital assets are used in a trade or business and are not investment property for purposes of section 163(d). King v. Commissioner, supra.Congress could have defined the property covered by section 163(d) in terms of the definition of capital asset but it did not do so. Accordingly, even if the Portage stock qualifies as a capital asset in petitioner's hands, that fact does not answer the question whether it is also "property held for investment" for purposes of section 163(d) nor, in this case, does it dispense with the need to review petitioner's motivation for acquiring and holding the stock. We turn to petitioners' argument. Petitioners ask the Court to replace the substantial investment motive test with the dominant motive test. Petitioners argue, without providing much analysis, that a taxpayer's predominant motivation should control in determining, for purposes of section 163(d), whether the property is held for investment or held in connection with a trade or business. As authority, petitioners rely primarily upon Waterman, Largen & Co. v. United States,419 F.2d 845 (Ct. Cl. 1969), cert. denied 400 U.S. 869 (1970), *187 a case which was specifically considered by this Court when the substantial investment motive test was adopted in W. W. Windle Co. v. Commissioner, supra.
In considering petitioners' position that the dominant motive test should be adopted, it might be argued that the Supreme Court's opinion in Arkansas Best did more than simply remove the gloss which had grown up around the Corn Products case. See Matter of Larson,862 F.2d 112, 117-18 (7th Cir. 1988). It might be contended that Arkansas Best removed the logic for our adoption of the substantial investment motive test in Miller and W. W. Windle. After Arkansas Best, according to that reasoning, it may be appropriate for the Court to reconsider its use of the substantial investment motive test for purposes of section 163(d), and, perhaps, to adopt the dominant motive test, the test used to sort out mixed business and investment motives and to resolve analogous questions in other areas. Cf. United States v. Generes,405 U.S. 93 (1972); Malat v. Riddell,383 U.S. 569 (1966). This may be especially true after the amendments to section *188 163 and addition of the passive loss limitation rules of section 469 made by the Tax Reform Act of 1986. Pub. L. 99-514, §§ 511(a), 501(a), 100 Stat. 2085, 2244, 2233. We decline petitioner's invitation to reconsider the proper test in this case because under either test, dominant motive or substantial investment motive, the facts require decision for respondent. The evidence of petitioner's motive for acquiring Mr. Bell's stock in Portage in 1977 consists primarily of Mr. Houston's testimony. Based upon his testimony, we have concluded that, in purchasing the Portage stock in 1977, Mr. Houston was motivated by a substantial investment objective and that he had no clear business objective which was the dominant reason for purchasing the stock. On direct examination, Mr. Houston stated as follows: Q. What was your motive then in making this acquisition [i.e. purchase of Portage Stock from Mr. Bell in 1977.] A. I could get my money back. And whatever happened after that, if it was positive great, if it was negative it wouldn't hurt me. During cross-examination, he stated as follows: Q. And as you stated you felt you would be able to get at least what you put *189 in the company. A. Correct, in salaries, if I stayed with the company for five years, I would be able to obtain that investment which, then anything could happen, it wouldn't make any difference. * * * Q. In fact, Mr. Houston, you felt the company, before you invested a total of five hundred fifty thousand dollars that that was a good investment. And that the company had potential for growth. A. I would be at least able to get my dollars back and once I got all my dollars invested in the company; once I got that back then it didn't matter what happened to the company, that was my objective, that was my business motive; as long as I was able to receive the salary to off-set the investment. [Emphasis supplied.] In effect, Mr. Houston's overall objective was to reduce or eliminate the risk of his investment in Portage stock by recouping the cost of the stock through salary and commissions. Petitioner testified, "And whatever happened after that, if it was positive great, if it was negative it wouldn't hurt * * *." At the same time, when Mr. Houston acquired the Portage stock in 1977, he anticipated a dramatic increase in company sales, i.e., from $ 5 million *190 "to $ 8.5 to $ 12 million in sales per year." Certainly, if any such increase in company sales were realized and were translated into an increase in the value of the company's stock, which it would be reasonable to expect, then the value of his stock in the company would have significantly increased. It is apparent, therefore, that petitioner had a substantial investment motive in acquiring Mr. Bell's Portage stock in 1977. Contrary to petitioners' argument that Mr. Houston purchased the Portage stock in 1977 for business reasons, nothing in his testimony or elsewhere in the record of this case articulates a clear, reasonable business motive for the purchase. His original acquisition of Portage stock in 1975 was purely an investment, albeit an investment which carried Mr. Bell's personal guarantee that Mr. Houston would recoup his investment from ordinary income, consisting of a combination of salary and insurance commissions. Petitioners do not contend otherwise. Petitioners contend that Mr. Houston paid $ 400,000 for Mr. Bell's stock in 1977 "to acquire the interest in Portage to protect the continuation of Portage, at least to secure a return of their original receivables. *191 " Petitioners further argue that Mr. Houston was "required to assume control [of Portage] to protect his original investment and avoid a collapse of the business operation of Portage Machine." In effect, petitioners make the incongruous argument that Mr. Houston's purchase of Portage stock in 1977 was necessary to protect his original investment and, thus, was business motivated. They attempt to establish business motive with a naked assertion that the purchase of Mr. Bell's stock was necessary to recover the remaining cost of Mr. Houston's original investment under Mr. Bell's personal guarantee. [2] We are not persuaded that Mr. Houston had any business motive for purchasing Portage stock in 1977 but, in any event, petitioners have not shown that any business motive that there may have been was the dominant reason for acquiring the stock. *192 First, petitioners ask the Court to accept at face value the proposition that Mr. Houston's predominant motive for investing approximately $ 400,000 was to assure the return of his original investment, $ 150,000, less whatever amount he had already received from Portage in 1975 and 1976 in commissions. Second, it appears generally from Mr. Houston's testimony that he received commissions of some kind from Portage in 1975 and 1976 in fulfillment of Mr. Bell's guarantee. However, the record does not reveal the precise amount or type of income he received from Portage in 1975 and 1976 nor is it evident why he was required to invest $ 400,000 in 1977 to assure the continuation of such income. For example, assuming that Mr. Houston received commissions from the placement of Portage's insurance, we do not know why he would necessarily lose that business unless he purchased Mr. Bell's stock. Moreover, Mr. Houston continued to own his original 25-percent interest in Portage, a publicly traded company. The record shows no reason why he could not have sold his interest in Portage and have realized not only a return of his investment but also a profit on the stock. Third, we cannot accept *193 at face value petitioners' argument that Portage's survival was in doubt and that Mr. Houston was forced to purchase Mr. Bell's stock in order to save the company and that he alone was capable of doing so. We can believe that Portage Machine would have lost business if Mr. Bell had not been removed as president and CEO. We cannot infer from the record that it was also necessary to purchase Mr. Bell's stock interest in the company. Nevertheless, even if we accept the proposition that Mr. Bell's removal as a stockholder was necessary for Portage's survival, we cannot conclude from the record in this case that Mr. Houston was the only person willing or able to purchase Mr. Bell's stock and effect Mr. Bell's removal. Mr. Houston brought nothing to the transaction other than that which any investor brings, capital. He had no experience or expertise in the machine tool industry and stated candidly that he relied upon existing personnel to run the company. Our review of the record leads us to believe that in 1977 petitioner was motivated purely by investment considerations to purchase Mr. Bell's Portage stock. He was quoted at the time predicting "greater growth now that the firm is *194 separated from the Bell scandal and * * *" a stock dispute involving the prior owners. Mr. Houston's prior investment in the company in 1975 had taught him that, with control of the company, he could finance his purchase of Mr. Bell's stock and recoup his investment through salary and insurance commissions and retain the stock for a potentially significant profit if sales of the company increased as he predicted at the time. In our view, when Mr. Bell became embroiled in personal problems, Mr. Houston stepped into the breach because he saw an opportunity to take over the company and possibly make a substantial profit with minimum capital at risk. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect for the relevant time period.↩
11. To the extent respondent would argue that Miller establishes a per se rule that sec. 163(d) is applicable anytime interest is incurred to purchase or maintain property which upon disposition produces capital gains or losses, his argument must be rejected. Besides property held by a trader as part of his trade or business of trading, personal use property receives capital treatment upon disposition even though such property is not held for investment. We do not believe that respondent would argue that sec. 163(d)↩ should be applied, for example, to personal residences.
2. Although it is not clear, petitioners may be claiming that, due to Mr. Bell's guarantee, Mr. Houston's stock in effect constituted an "account * * * receivable acquired in the ordinary course of trade or business * * *," and thus a non-capital asset under section 1221(4). If so, we reject this argument because there is no evidence in the record to show that the stock or the guarantee was an "account receivable," i.e., that it was given in payment for goods sold or services rendered, and, as we conclude infra,↩ petitioners have not shown that the stock or guarantee was sufficiently related to any trade or business conducted by them to be considered acquired "in connection with," let alone "in the ordinary course of," any such trade or business.