J. ASHTON WRAY, JR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wray v. Commissioner
Docket No. 14462-92
United States Tax Court
T.C. Memo 1993-525; 1993 Tax Ct. Memo LEXIS 537; 66 T.C.M. (CCH) 1289; November 16, 1993, Filed *537 Decision will be entered for respondent. For petitioner: William J. Dougherty, Jr.
For respondent: Richard F. Stein. KORNER
KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: By notice of deficiency dated April 2, 1992, respondent determined the following deficiencies in and additions to petitioner's Federal income tax for the years 1980 through 1986: Additions to Tax Year
Deficiency
Sec.
Sec.
Sec.
Sec. 6661
6651(a)
6653(a)(1) a
6653(a)(2) a
1980
$ 30,397.00
$  7,599
$ 1,520
b
-- 1981
25,148.00
6,287
1,257
b
-- 1982
42,690.50
10,673
2,135
b
$ 10,673
1983
28,067.50
7,017
1,403
b
7,017
1984
37,730.00
9,433
1,887
b
9,433
1985
52,724.00
13,181
2,636
b
13,181
1986
69,331.00
17,333
3,467
b
17,333
a Sec. 6653(a)(1)(A) and (B) for 1986.
b 50 percent of the interest due on the deficiencies.
After concessions, [1] the issues for decision are: (1) Whether petitioner was engaged in the trade or business of seeking out and promoting new business opportunities so that his interest deductions are ordinary and necessary business expenses and not merely deductible as investment interest, with its *538 corresponding limitations; and (2) whether petitioner is liable for the section 6661 addition to tax due to a substantial understatement of tax. Unless otherwise indicated, statutory references are to the Internal Revenue Code in effect for the years in issue, and Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts are stipulated and are so found. The stipulation of facts and *539 attached exhibits are incorporated by this reference. Petitioner's place of residence was Newport News, Virginia, on June 29, 1992, the date the petition was filed in this case. Petitioner, John Ashton Wray, Jr., was admitted to the Virginia and Federal bars in 1970. During the years in issue, he practiced as a trial attorney under the professional corporation of J. Ashton Wray, P.C., and was also its sole shareholder and an employee. The record does not indicate whether petitioner filed Forms 1120 or 1120S for this corporation for the years in issue. Petitioner attached to each of his Forms 1040 for the years in issue a separate Schedule C, indicating the pursuit of a second business activity, that of brokerage or finance investment. Projects or ventures petitioner pursued outside his legal practice will be discussed separately for ease of discussion. The funding of these ventures will be described first. Investment Account
Petitioner maintained an investment account into which he deposited funds loaned to him from various individuals, allegedly to invest for them. Petitioner testified that investors would come to him because of his reputation as an organizer and financier *540 of businesses, an entrepreneur, and a pursuer of a number of business interests. These individuals, whom we prefer to call payees, would allegedly be interested in petitioner's projects and would offer funds in return for an above-market rate of interest, funds that allowed petitioner to pursue his projects. These payees would write petitioner a check and, in turn, petitioner would execute and sign as maker a preprinted promissory note for the amount of the check. Petitioner offered interest rates (stated or inferred) ranging from a low of 7.5 percent to a high of 50 percent with the majority of payees receiving a 25- or 30-percent rate. Most notes indicated that the parties could agree to one or more extensions of the time for payment. Although the notes stated that they were payable on demand, the maturity dates were typically 3 years from execution. Petitioner encouraged note holders to extend their due dates by offering the same or higher rate of interest. If these payees found the offered rate acceptable, petitioner added another 3 years to the maturity date of the original note. Most payees would roll over at least some part of their principal in this manner. If the *541 payees wanted the principal amount due, petitioner issued a check drawn on this same investment account. Should funds be insufficient, petitioner would draw funds out of his law account to meet the obligation. Petitioner testified that he used this one account to pay for business expenses, interest and principal expenses to payees, travel, and to pursue projects, as well as to pay salary or "guaranteed" payments to Edward F. Brown (Brown), petitioner's associate. Petitioner became acquainted with Brown in connection with an unsuccessful venture during the 1970s and began to advance Brown moneys to travel to Saudi Arabia, with the understanding that should Brown make contacts and identify opportunities that interested petitioner from a business standpoint, then petitioner would continue to advance Brown moneys. Petitioner's interest in Saudi Arabia grew out of a desire to become involved with some of the richest clients in the world in the hope of developing a lucrative legal relationship. Through Brown, petitioner was introduced to Sheik Hamid Al-Harbi (Hamid) and his brother, Sheik Misfer Suliman Al-Harbi (Misfer). A number of potential projects developed out of these relationships, *542 but only two occurred during the years in issue. Caterpillar Imports Into Saudi Arabia
Upon hearing that the Saudi Government intended to build a Trans-Peninsula Railroad, petitioner became interested in importing and selling Caterpillar 966C front-end loaders there. Petitioner made a number of trips to Saudi Arabia to speak with Hamid and Misfer regarding the importing and selling of these machines. At the time, the family of Ziad was the sole distributor of Caterpillar brand products in Saudi Arabia, but through petitioner's investigations (which included the checking of Ziad's showroom prices), petitioner felt he could be much more competitive and earn a significant return. Hamid's and Misfer's critical role was to include soliciting and dealing directly with potential buyers for contracts of sale, as petitioner felt direct solicitations by foreigners would not succeed in Saudi Arabia. To pursue this idea, petitioner prepared and mailed articles of incorporation on December 8, 1978, to the Virginia State Corporation Commission, incorporating Tri-Con Development, Inc. The principal parties involved were petitioner, Brown, and Hamid; however, the capacity in which they *543 were involved remains unknown. Between September 1978 and November 1979, these parties investigated the cost of Caterpillars, and towards this purpose petitioner, Brown, Hamid, and Misfer traveled to Caterpillar distributorships in Edmonton and Toronto, Canada. Ultimately, three machines were purchased. Petitioner believed there would be no problem selling 100 machines in Saudi Arabia; however, this venture soured when the Saudi Government eliminated the Trans-Peninsula Railroad project from its budget in favor of building schools. As a result, potential buyers backed out, causing petitioner to panic and fly to Jeddah, begging Hamid to locate buyers for the three Caterpillars purchased. Eventually buyers were found, but the last sale became very labored and took place in the summer of 1981, approximately 6 months after the first sale. Petitioner admits he did not report the meager $ 1,171 he earned from these three sales. Petitioner claimed he benefited in terms of the introductions he received through Hamid and Misfer to industry contacts in Saudi Arabia. Arabian Eurasia Management Consulting Organization (AEMCO)
During 1979, petitioner perceived Saudi Arabia as a *544 Third World country in terms of its advertising; Jeddah had but one high rise building, and people were still living in tents; there was no radio or billboards, and the Government controlled television. AEMCO, a subsidiary of the Misfer Suliman Al-Harbi Establishment, was to be the solution, and its purpose was to import computer equipment and software to create a computerized database of available products from which potential purchasers could contact sellers. This venture was ultimately unsuccessful, and petitioner again did not bill for any legal fees or receive any monetary gain from the undisclosed services he performed. However, of greatest importance to petitioner was the fact that his picture appeared as legal counsel to Misfer in an advertising brochure that was produced for this venture. Consequently, petitioner believed this breakthrough would mean that he would become a legal consultant to the very wealthy. Brown was also listed in this same advertising brochure as the financial adviser to Misfer. Siniat
On February 11, 1980, petitioner and Brown formed the corporation of Brown and Wray, Inc., for the purpose of providing consulting work in the form of legal *545 and investment counseling for a project known as Siniat. The purpose of the project was to secure a $ 30 million contract for the cleaning of the Jeddah airport; however, the corporation was unsuccessful in obtaining the contract when its representative did not show up for a scheduled appointment. Brown and Wray, Inc., received no monetary compensation for its undefined involvement. Gloria Manufacturing Co. and Successors (Gloria)
Petitioner was involved with Gloria and its successors (below) for the years 1983 through 1986. Gloria, an established clothing manufacturer in Newport News, Virginia, was owned by Walter and Gloria Goodman. When Gloria could not obtain traditional financing from a bank due to its extensive credit problems, it turned to petitioner because of his reputation for raising needed cash. Petitioner began to pay weekly salaries for Gloria's 200 to 400 tailors. When payment came due for interest on the alleged loans petitioner provided, Mrs. Goodman continuously indicated that she lacked sufficient funds for salaries or some other pressing need. Petitioner allowed Gloria to extend payments due him. Although risky, petitioner continued this arrangement *546 because Gloria had shown him a very lucrative lease it had won from the city of Newport News, dated June 23, 1981, and Gloria promised that if Gloria's successor in interest (Michael's or Solomon's) became profitable, petitioner would receive a one-third share of the unoccupied portion of the leasehold as consideration for the financing and consulting services he was providing. This lease allowed Gloria to occupy an old Sears building at 2700 Huntington Avenue in Newport News, Virginia, for what was believed to be a "sweetheart deal". The 50 cents a square foot seemed extraordinarily low when priced against comparable lease values of $ 4 to $ 7 a square foot. Gloria's manufacturing would utilize merely 50 percent of the available space, and the remaining 50 percent was available for other pursuits. Gloria held out the promised one-third interest (15 percent of the total square footage) as a carrot for petitioner to continue supplying funds. The lease term was 15 years with a renewal option for an additional 25 years. Petitioner also was told that this Sears building was in close proximity to an interstate connection and as soon as a planned bridge was completed, traffic would *547 virtually spill out onto its doorsteps. This bridge, however, was not actually completed until 1991 or 1992. Michael's Closet (Michael's)
As concessions for this "sweet deal", the city insisted that there be new management, as well as renovations due to problems that it had previously experienced with Gloria and the Goodmans. Gloria continued to hold the lease, but prior to March 1, 1984, Michael's became the manufacturing operator. Another impetus for petitioner to continue loaning money to Gloria and its successors was Michael's success in gaining a contract to manufacture Cabbage Patch Dolls (a popular children's toy at the time) and clothing for a French designer named Jean Claude. Also, there was talk of the Government's building a regional distribution center near Fort Eustis in Newport News. Someone proposed that if Michael's was sold to a minority-owned firm (Solomon's) as defined by the Small Business Administration, it could qualify for section 8(a) [2] status, which would give the firm a unique competitive advantage because of access to Government loans and, more importantly, valuable Government set-aside contracts on the manufacture of uniforms, cots, and all *548 the things that the Government needed. Not surprisingly, Brown, who from the record appears to be black, was presented as the needed minority. Solomon's Array, Inc. (Solomon's)
Petitioner assisted Brown in drafting the petition for section 8(a) status. A minority person must own at least 51 percent [3] of the firm to qualify. Petitioner and Brown agreed that petitioner would receive a minority stock interest, as well as a similar profits interest (somewhere in the neighborhood of a 60/40 split), in Solomon's. Petitioner incorporated Solomon's and became its secretary, but (despite his agreement with Brown) not a shareholder, and Brown became its president and sole shareholder. Due to Brown's lack of experience regarding the manufacture of clothing, as well as his lack of financial resources, he was required *549 to execute a management agreement in conjunction with the contract of sale before the principals would allow him to purchase Michael's. Under this agreement, Mr. Goodman would supervise the daily activities of Solomon's for a period of 6 years or until two-thirds of the principal on the purchase price had been paid, as he had the necessary experience and contacts in the garment industry. Thereafter, on March 1, 1984, Michael's entered into the contract to sell its business (drafted by petitioner) as a going concern to Solomon's for $ 3,750,000. The agreement required $ 10 down with $ 500,000 due in 12 months and a $ 3,250,000 note payable in installments of $ 325,000 per year to begin in 24 months, with interest waived for the first 2 years. The contract for sale included a provision whereby Michael's could regain the lease of the Sears premises and its stock in the event Solomon's defaulted on the note. It appears that Solomon's did default, as a document dated *550 March 7, 1985, was prepared by petitioner, which indicated that Solomon's and Michael's agreed to mutually rescind the above contract of sale. Petitioner performed the following services for Gloria and its successor organizations. He prepared necessary documents, such as articles of incorporation, contracts of sale, and the management agreement, as well as Brown's petition for section 8(a) status. Petitioner also represented these organizations in different capacities and among several parties such as the Internal Revenue Service (IRS), city officials and owners of Michael's, and union representatives in negotiations for Solomon's. Every day throughout this period petitioner alleged he was at the plant, at least to give a 1-hour daily progress report on where Gloria and its successors stood with the union, the IRS, the city, and updates on the progress Gloria was making in bill paying. Petitioner never billed Gloria or its successors in interest for his legal services as he felt he would gain a one-third interest in the unused leasehold of Sears from the Goodmans. Petitioner also never included any interest income from Gloria and its successors on his tax returns for the years *551 involved. Petitioner states he never received any benefit from the promised leasehold interest from Gloria or Michael's, and we do not know if he ever received any payments towards the principal amount of the loans he made. Petitioner filed individual income tax returns for the years 1979 through 1983 in March 1986. He filed married, filing separate income tax returns, for the years 1984, 1985, and 1986 on January 12, 1987, April 25, 1988, and December 9, 1988, respectively. All returns were filed untimely. Pursuant to section 6501(c)(4), respondent secured four Forms 872, Consent to Extend the Time to Assess Tax, from petitioner, which properly allowed respondent to extend the normal 3-year period for assessment. For each of the years in issue, petitioner reported the following types of income and (losses) on Forms 1040: Interest
Capital Sch. C Sch. E
Year
Wages
Income
Gain
Business Rental
Partnership
1980
$  98,916
$ 3,668
0 $  (80,278)
$ (11,732)
0  1981
104,310
1,744
0 (83,678)
(13,483)
0  1982
109,834
1,316
$  2,400
(166,170)
(11,712)
0  1983
101,971
334
0 (82,712)
(10,539)
0  1984
112,615
647
0 (206,686)
(5,581)
$ 543 1985
149,412
331
0 (335,618)
(13,253)
871 1986
160,491
346
18,432
(432,829)
(5,819)
(139)
*552 On page 1 of each Form 1040 petitioner filed for the years 1980 through 1985, he described his occupation as "attorney" and included the above wages from J. Ashton Wray, Jr., Professional Corp. Petitioner, with each Form 1040, included one Schedule C, Profit or (Loss) From Business or Profession, for every year in issue. On each Schedule C, petitioner designated a business activity apart from his wage as "Brokerage", and the service he provided as "Finance Investment". Petitioner assigned the activity a code #5751, which described the activity as security broker or investment services. Petitioner did not report a dollar of income on any of these Schedules C for any year in issue. The following chart illustrates that significant operating losses from petitioner's alleged Schedule C activity were generated solely by petitioner's claimed travel and entertainment and interest expenses paid to investors: Interest Paid
Total Schedule C Year
Travel & Ent.
to Investors Loss
1980
$ 21,478
$   58,800
($   80,278)
1981
14,211
69,467
(83,678)
1982
18,178
147,992
(166,170)
1983
6,259
76,453
(82,712)
1984
15,294
191,392
(206,686)
1985
2,057
333,561
(335,618)
1986
0 432,829
(432,829)
$ 77,477
$ 1,310,494
$ (1,387,971)
*553 As noted, petitioner has conceded the deductions for travel and entertainment. However, the recharacterization by respondent of the above interest deductions is the principal dispute in this case. [4]
As far as this Court can tell, for all *554 the years in issue, petitioner shows a mere $ 2 in Federal tax owing on his Form 1040 for the year 1985 due to an investment credit recapture. OPINION I. Investment or "Trade or Business" Interest Expense
Prior to 1969, taxpayers could effectively insulate salaries and other income from tax by incurring substantial interest expenses on funds borrowed to acquire investment assets which generated little or no investment income. The Code at that time allowed an unlimited itemized deduction for all interest paid or accrued during a tax year, irrespective of character. Sec. 163; H. Rept. 91-413 (1969), 1969-3 C.B. 200, 245-246. As a result, Congress added section 163(d) as part of the Tax Reform Act of 1969, Pub. L. 91-172, sec. 221, 83 Stat. 487, 574, limiting interest deductions on funds borrowed to acquire or carry investment assets. Cf. Lenz v. Commissioner, 101 T.C.     (1993); Beyer v. Commissioner, 916 F.2d 153 (4th Cir. 1990), revg. 92 T.C. 1304 (1989). However, the interest on funds borrowed in connection with a "trade or business" was not so limited. Sec. 163(a), (d); H. *555 Rept 91-413, supra, 1969-3 C.B. at 246. The Code and regulations do not define "trade or business" but leave this inherently factual analysis for the courts to determine based upon the facts in each individual case. Higgins v. Commissioner, 312 U.S. 212, 215-217 (1941). Petitioner, however, bears the burden of proving he was engaged in a trade or business. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). What is petitioner's trade or business? Petitioner contends: (1) From 1975 through 1980, he was engaged through a partnership with Brown in the trade or business of seeking out business opportunities which petitioner could then promote, and from 1983 through 1986, he was engaged similarly but individually in promoting Gloria and its successors; or alternatively (2) petitioner throughout the years in issue regularly, continuously, and extensively engaged in activities directed at pursuing the discovery and promotion of new ventures, which rose to the level of a trade or business separate and apart from his law practice. While it is true that the trade or business test must be applied *556 at the partnership level, and a partner may be individually engaged in a trade or business by reason of his participation in a partnership, petitioner herein has not proven that he was a member of a partnership that included Brown; to the contrary, petitioner stipulated that he and Brown formed the corporation of Brown and Wray, Inc., on February 11, 1980, and that petitioner also formed, with Brown and Hamid, Tri-Con Development, Inc., on December 8, 1978. Sec. 761(b); see Goodwin v. Commissioner, 75 T.C. 424, 437-438 (1980), affd. without published opinion 691 F.2d 490 (3d Cir. 1982). The general test for determining the validity of partnerships for income tax purposes is whether the parties in good faith and acting with a business purpose intended to join together in the present conduct of an enterprise, considering facts which are reflective of intent. Commissioner v. Culbertson, 337 U.S. 733, 742 (1949). A sharing of profits is required. Podell v. Commissioner, 55 T.C. 429, 431 (1970). This record is devoid of information indicating any such agreement *557 between Brown and petitioner. Also, it is notable that Brown was not called as a witness. The fact that petitioner offered to pay for Brown's flights to Saudi Arabia in return for information on business opportunities is insufficient. A joint undertaking merely to share expenses does not create a partnership. Sec. 1.761-1(a), Income Tax Regs. It is apparent that some sort of relationship existed between petitioner and Brown, but it remains a mystery what that relationship was; therefore, quite simply, petitioner has not meet his burden on this question. Having disposed of petitioner's contention that he was engaged in a partnership with Brown and simultaneously eliminating the second half of that argument, we turn to whether petitioner's activities during the years in issue, and apart from his law practice, rise to that narrow plane of engaging in the separate trade or business of promoting new business ventures. To be engaged in a trade or business, a taxpayer must be involved in the activity with continuity and regularity; also, the taxpayer's primary purpose for engaging in the activity must be for income or profit, and his activities cannot be sporadic, diversionary, or *558 in the nature of a hobby. Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987). The Supreme Court in Whipple v. Commissioner, 373 U.S. 193 (1963), requires an additional hurdle peculiar to the trade or business of promoting: income received directly for a taxpayer's services such as fees or commissions. Since investing is not a trade or business, when the only return a taxpayer receives for his service to a corporation is that of an investor, he has not satisfied his burden of demonstrating that he is engaged in a trade or business. Income received indirectly through a corporation in the form of dividends or enhancement in value of an investment is not sufficient. Developing corporations as going concerns with the immediate purpose of selling the corporations to customers in the ordinary course at a profit is required. Whipple v. Commissioner, supra at 203. It is this early resale that makes the profits directly received for services relate to a trade or business, for the longer an interest is held, the more profit becomes attributable to the successful operation of the corporate *559 business, and the return becomes that of an investor. Deely v. Commissioner, 73 T.C. 1081, 1093 (1980). The difficulty of meeting this standard is illustrated by the Supreme Court's following statement: "If full-time service to one corporation does not alone amount to a trade or business, which it does not, it is difficult to understand how the same service to many corporations would suffice." Whipple v. Commissioner, supra at 202. It is clear that the Supreme Court places great emphasis on the nature of the income a taxpayer receives or expects to receive. Townshend v. United States, 181 Ct. Cl. 635, 384 F.2d 1008, 1012 (1967). For the years in issue, cumulatively or standing alone, petitioner herein involved himself neither regularly nor continuously in his investment endeavors, and in no instance did petitioner seek any fees as compensation for the services he performed. For the years 1981 and 1982, petitioner appears to have pursued no promotional opportunities, and during the period 1983 to 1986, petitioner intermittently performed services for Gloria which, at *560 most, amounted to a mere 1-hour daily progress report. This does not even approach the nearly 60-80 hours that the taxpayer in Commissioner v. Groetzinger, supra at 24, spent per week wagering, or the full-time effort the taxpayer in Biernbaum v. Commissioner, T.C. Memo. 1963-210, expended in promoting and developing shopping centers. Petitioner misplaces his reliance in Biernbaum, as that taxpayer's level of activity far exceeded petitioner's involvement herein. The taxpayer, a promoter of shopping centers over the course of 6 years, became extensively involved in 14 different centers. With each project, the taxpayer followed similar procedures. He would select a suitable site, obtain options for land, or make other arrangements to acquire a site. He sought investors to provide funds for acquisition and construction, or borrowed funds himself. In some cases, he prepared a brochure to describe the project to possible investors or tenants. He solicited tenants and secured leases. He obtained building permits, arranged for zoning, and negotiated financing. Usually before construction began, a corporation *561 was organized to build and operate the center. He supervised construction after these preliminary arrangements were made, and as the investors advanced funds, the taxpayer transferred the option or land to the center, assigned the leases, and would have the corporation execute a mortgage. He was usually an officer and a director, which allowed him to act for the corporation, but he drew no salary. The investors received stock. Unlike petitioner, the taxpayer's ventures in Biernbaum were frequent and within the narrow and specialized field of promoting solely shopping centers rather than being random attempts to turn a profit. Biernbaum v. Commissioner, supra.As far as this Court can tell, aside from Gloria, petitioner was involved in only two projects during the years in issue. Petitioner's level of involvement in Siniat was not described but would have been minimal at best, and most of the activity required for the Caterpillar venture occurred prior to the years in issue. Petitioner here also never reported a dollar of income for any venture he pursued on any Schedule C for the years in issue, and he received no Forms K-1 from either *562 Tri-Con, Inc., or Brown and Wray, Inc., or from the partnership petitioner alleged existed between him and Brown. Petitioner admitted receiving, but did not report, the meager sum of $ 1,171 from the three Caterpillar sales. Not unlike Cheh v. Commissioner, T.C. Memo. 1992-658, it is this Court's belief that petitioner's primary desire was not to earn a profit or to make a living but to develop trust which would possibly lead to more involvement and legal referrals from the sheiks in Saudi Arabia. Promises and hopes are the common thread running through petitioner's tale: the hope of hitching his wagon to a sheik and becoming legal counsel to the rich and famous. Similarly, in Nichols v. Commissioner, 29 T.C. 1140, 1147 (1958), the taxpayer had some indefinite, generalized hope that future profit might develop in the wake of the loans he had made to a corporation of which he was a shareholder, but the vagueness of the arrangements, the lack of any definite understanding or agreement, and the failure to condition the loans upon some ascertainable requirement combined to paint a picture which fell short of, and was inconsistent *563 with, the view that the funds the taxpayer therein invested were related to any trade or business in which the taxpayer was involved. This Court cannot even determine that petitioner herein received or expected a return similar to that of an investor, much less determine that petitioner was pursuing income as compensation for his services. Petitioner never affirmatively negotiated a fee or billed for any services performed, and he never obtained guarantees or commitments on any promised returns. Nothing in writing appears in evidence. It appears petitioner risked much in terms of funds or capital invested in these ventures. He signed as maker and was personally liable for paying the generous rates of interest he offered his payees. Petitioner offered an effective rate of 40 percent to payees on the funds he invested in Gloria, yet petitioner was allegedly never paid interest from Gloria on the alleged loans, and it is unclear whether any principal sums were repaid. It seems more likely that these sums were considered capital contributions as there is no evidence of any notes receivable from Gloria. Petitioner continued providing funds to Gloria to ensure the corporation would *564 continue in existence, when its true profit potential could be realized. Thus, his success became increasingly tied to that of Gloria. These loans or contributions were made to Gloria for no other purpose than to protect or enhance petitioner's investment. Cf. Millsap v. Commissioner, 46 T.C. 751, 757 (1966), affd. 387 F.2d 420 (8th Cir. 1968). We do not believe that petitioner's payees were interested in the success of his projects but only in the rates of return they would receive for the use of their money. The record does not disclose that petitioner ever promised or delivered anything of value to the lenders on the funds he borrowed, other than the interest which he paid. While we agree with petitioner's assertion that he would have to make a spectacular return to pay back his payees' loans, this assertion without more does not prove that he would have earned such a return and, in fact, leads this Court not only to question petitioner's activities but also his judgment in making these types of loans. [5] Unlike Biernbaum v. Commissioner, supra, where the investors independently decided *565 whether to proceed with a center, petitioner herein controlled the destination of funds he paid out, and he directed those funds into the particular ventures he was interested in pursuing through the investment account he maintained for such purpose. Neither the promised interest in the unused Gloria leasehold nor the promised equity and profits interest from Solomon's materialized for petitioner, and petitioner has not explained why or proven to us that either of these promises would have provided a return unlike that which an investor would receive. It is also very significant that petitioner was not dependent on his promoting or lending activities for a living due to his substantial source of income as a trial attorney, as indicated by the fact that his wages *566 for the years in issue increased every year from $ 98,916 in 1980 to $ 160,491 by 1986. Also, not unlike the taxpayer in Houston v. Commissioner, T.C. Memo. 1989-175, petitioner brought nothing but his negotiating and legal skills as well as his capital to Gloria and other projects. He had no experience in the clothing industry or any of the businesses he endeavored to promote, and he relied on Gloria's existing personnel to run the day-to-day operations as he continued working full time as an attorney. Petitioner's activities carry attributes of investment and bear no resemblance to fees or compensation for services. Also, petitioner was very successful in avoiding taxes throughout the years in issue in the precise manner which Congress specifically sought to prevent when it enacted section 163(d). Whatever petitioner's activities, he fails all the tests required for achieving the carrying on of any secondary trade or business, including that of promoting new businesses. Respondent's recharacterization will stand. II. Net Operating Losses
Due to our sustaining respondent, as above, petitioner did not sustain the claimed net operating *567 losses under section 172 for the years in issue; therefore, there are no carryovers except to the extent that these recharacterized interest deductions create investment interest carryovers under section 163(d)(2). III. Additions to Tax Under Section 6661
The final issue we address is the section 6661(a) [6] addition to tax, which imposes a 25-percent addition on underpayments assessed after October 21, 1986, for returns due prior to January 1, 1990. Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, sec. 8002, 100 Stat 1874, 1951; Pallottini v. Commissioner, 90 T.C. 498, 503 (1988); Vessio v. Commissioner, T.C. Memo. 1990-565. A taxpayer has "substantially understated" his income tax for a particular year if the amount of understatement exceeds the greater of $ 5,000 or 10 percent of the tax required to be shown on taxpayer's return. Sec. 6661(b)(1)(A). Due to petitioner's concessions and our conclusion that petitioner was not engaged in a separate trade or business apart from his law practice for any of the years in issue, the resulting understatement far exceeds these threshold amounts for this addition *568 of tax to apply. An understatement can, however, be reduced where a taxpayer has adequately disclosed the relevant facts on his return, or in a statement attached thereto, or if there is substantial authority for the taxpayer's treatment of any item. Sec. 6661(b)(2)(A)(i) and (ii). A taxpayer who merely lists the amount and nature of an expense on the proper tax form has not provided a disclosure sufficient to enable respondent to identify the potential issue involved unless an applicable revenue procedure specifically provides that disclosure can be satisfied for an item simply by following the applicable forms and publications. Accardo v. Commissioner, 94 T.C. 96, 101 (1990), *569 affd. 942 F.2d 444 (7th Cir. 1991). Rev. Proc. 87-48, 1987-2 C.B. 645, specifically requires additional disclosure for amounts claimed under section 163(d), preferably by filing Form 4952, Investment Interest Expense Deduction. Petitioner herein has not filed Form 4952, Form 8275, or attached a statement to his returns identifying the interest expense in a manner that would reasonably apprise respondent of the nature of the potential controversy concerning his tax treatment; therefore, petitioner did not adequately disclose facts relevant to his Schedule C claimed business interest deductions sufficient to fall within this safe haven. Sec. 1.6661-4(b), Income Tax Regs.
Whether a taxpayer has substantial authority for a position he has taken on a return is determined by engaging in the same analysis a court would be expected to follow in evaluating the tax treatment of the item at issue. Sec. 1.6661-3(b)(3), Income Tax Regs. The weight of authorities in support of the taxpayer's position must be substantial compared to the weight of authorities contrary to his position. Sec. 1.6661-3(b)(1), Income Tax Regs. *570 Substantial authority is determined at the time the return containing the item is filed or on the last day of the tax year to which it relates. Sec. 1.6661-3(b)(4)(iii), Income Tax Regs. Petitioner herein filed all returns well beyond 1963, when the Supreme Court in Whipple v. Commissioner, 373 U.S. at 193, added additional hurdles peculiar to the trade or business of promoting, and well after Biernbaum v. Commissioner, T.C. Memo. 1963-210, which was decided by this Court directly on the heels of Whipple v. Commissioner, supra, and whose holding should have put petitioner on notice regarding the level of activity required for any trade or business, particularly that of promoting. Petitioner's activities herein did not meet any of the required standards for a trade or business. Petitioner has engaged in activities neither continuously nor regularly but has done so very sporadically and in a capacity that is not entirely clear. Also, petitioner has not endeavored to sell his ventures in the ordinary course so as to compensate petitioner for services performed. Petitioner was satisfied *571 with merely the future hope of reward, a return not unlike that of an investor. The weight of authorities is substantially contrary to petitioner's position; therefore, petitioner has not reduced this addition to tax under either safe haven of section 6661. Decision will be entered for respondent. Footnotes
1. Respondent disallowed all petitioner's claimed travel and entertainment expenses; petitioner concedes these deductions due to both a lack of substantiation and the fact that these expenses were attributable to another taxpayer; namely, Brown and Wray, Inc.
Respondent increased petitioner's income from 1982 by $ 16,127 in unreported income. Petitioner concedes that $ 15,346 was received from R & J Associates and $ 781 from Saxon Oil, but was not reported. To the extent that a deficiency is determined in this case, petitioner also concedes secs. 6651(a) and 6653(a) additions to tax.↩
2. Sec. 8(a) was added to the Small Business Act of 1953, by the Small Business Act of 1958, Pub. L. 85-536, 72 Stat. 384, and is presently 15 U.S.C. sec. 637(a) (1988)↩.
3. As provided by 13 C.F.R. sec. 124.103 (1993)↩.
4. In addition, respondent recharacterized an additional $ 44,220 in interest expenses as investment interest which petitioner claimed on two different schedules attached to his Form 1040. The Schedule A category labeled "other interest" to various banks was recharacterized for all years except 1981, and Schedule E interest expenses claimed in connection with three of petitioner's rental properties were recharacterized by respondent for the years 1980 and 1981. Petitioner presented no evidence disputing these determinations at trial; therefore, without more, petitioner has not met his burden of proof regarding the recharacterization of these expenses, and they will not be further discussed. Rule 142(a); Welch v. Helvering, 290 U.S. 111↩ (1933).
5. We refer petitioner to the Va. Code of Responsibility, pt. 6, sec. II (1983); particularly, disciplinary rules DR 5-104: limiting business relations with a client, and DR 9-102-103: preserving the identity of client funds and record-keeping requirements.↩
6. Sec. 6661 was enacted with the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, sec. 323, 96 Stat. 324, 613, and is effective for returns due after 1982. The Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, sec. 6662, 103 Stat. 2106, 2395, lowered the rate from 25 percent to 20 percent and incorporated former sec. 6661 within current sec. 6662(d).↩